**RECONSTRUCTION FINANCE CORPORATION v. CENTRAL REPUBLIC TRUST CO. et al.**

No. 14189.

District Court, N. D. Illinois, E. D.

Nov. 7, 1936.

See, also, 11 F.Supp. 976.

John L. Hopkins, O. John Rogge, James A. Sprowl, George F. James, Jr., Floyd M. Rett, and George E. McMurray, all of Chicago, Ill., and James B. Alley, Max O'Rell Truitt, Harold Rosenwald, and Hans A. Klagsbrunn, all of Washington, D. C., for plaintiff.

Henry J. & Charles Aaron, Ader & Ader, Maurice Alschuler, Altheimer, Mayer, Woods & Smith, Amberg, Ott, Dahlin & Livingston, George S. Anderson, Leonard A. Ash, Ashcraft & Ashcraft, Norman Asher, Baldwin & Rugen, Maurice A. Barancik, and John Potts Barnes, all of Chicago, Ill., F. W. Barrett, of Springfield, Mo., and K. B. Barrett, William C. Bausch, Alfred W. Bays, Beach, Fathchild & Scofield, Alfred Beck, Bell, Boyd & Marshall, Albert Belshe, Berger & Newmark, Russell T. Berry, E. A. Biggs, Sr., George E. Billett, Bither & Bither, Guy M. Blake, Arthur E. Boroughf, George G. Both, L. M. Bowden, Preston Boyden, Boyle, Murphy & Nelson, Brelin, Britton & Landon, Brewer, Smith & Farrell, Bernard J. Brown, Isidore Brown, Bryant, Roberts, Hwass & Lewe, Geo. T. Buckingham, John C. Bulger, Burke, Jackson & Burke, D. F. Bustin, Butler, Pope, Ballard & Elting, Butz von Ammon & Marx, August J. Calcagno, Cameron & Heath, Campbell, Clithero & Fischer, Irving B. Campbell, Carnahan, Slusser & Mitchell, Castle, Williams & McCarthy, Cattell & Waldron, Chadwick & Johnson, Chapman & Cutler, Joseph Chavkin, Wm. T. Church, Ernest W. Clark, H. J. Clark, Charles L. Cobb, Cohen, Tomas & Cohen, Meyer Cohn, Seymour N. Cohen, Concannon & Dillon, Alfred M. Cordell, Cummings & Wyman, Cummins, Hagenah & Flynn, Cutting, Moore & Sidley, Dankowski & Dankowski, Percy B. Davis, Decker, Golden & Perlman, Thomas G. Deering, Defrees, Buckingham, Jones & Hoffman, Dent, Weichelt & Hampton, Donald B. Dodd, Homer A. Dodge, Dunbar & Rich, Eckert & Peterson, Ellis & Hackett, Mark H. Ellis, Samuel A. & Leonard B. Ettelson, Herman Fabry, Harold A. Fein, Fischel, Kahn & Heart, Thomas H. Fisher, William J. Flaherty, A. L. Flynn, Lee J. Frank, Bernard Allen Fried, Robert Friedlander, Herbert J. Friedman, Albert W. Froehde, A. S. & E. W. Froehlich, Gallagher, Rinaker, Wilkinson & Hall, Charles J. Gallagher, Gann, Secord & Stead, Gardner, Carton & Douglas, A. R. Gates, Demetrius A. Geroulis, J. T. Gilbert, George Gillette, James R. Glass, Harold M. Goldstein, Ivan B. Goode, Gordon, Pierce & Edmonds, George A. Gordon, Henry L. Graf, Charles F. Grimes, Grossman & Edelstein, Samuel P. Gurman, J. Milton Guy, Jr., Nathan Haffenberg, Albert E. Hallett, Jr., Jacob G. Hamer, Walter Hamilton, Oscar Wycliff Harman, Heile, Cavender, Milchrist & Kaiser, Heineman & Langsett, Ernest J. Hewitt, Richard Hill, Jr., Charles S. Hirsch, Harold H. Hollowick, Samuel C. Horwitz, Arthur J. Hughes, John E. Hughes, Harry D. Irwin, Jacobson, Merrick, Nierman & Silbert, M. A. Jersild, Johnson, Johnson & Johnson, Johnson, Swanstrom, Wiles & Clawson, John E. Johnson, Samuel E. Johnson, William R. Jordan, Bernard F. Johnston, Roy Juul, Kamfner, Halligan & Marks, I. J. Karlin, Samuel Kassel, G. A. Kelly, H. E. Kelly & Wm. M. Kelly, Kerner, Jaros & Tittle, Kirkland, Fleming, Green, Martin & Ellis, Kirkland, Tollkuehn, Finn & Smith, Knapp, Beye, Allen & Cushing, Morris Kompel, Edward H. Kubitz, Edward K. LaTocha, Urban A. Lavery, Samuel T. Lawton, Lederer, Livingston, Kahn, Adler & Adsit, John M. Lee, Morris Leibman, Levinson, Becker, Gilbert, Peebles & Swiren, A. C. Lewis, I. P. Lewis, Isaac B. Lipson, Litsinger, Healy, Reid & Bye, Lord, Lloyd & Bissell, Harry J. Lurie, Luster & Luster, MacChesney, Becker & Wells, Daniel L. Madden, John Mann, Wm. Mannhardt, George S. Marks, F. E. Matthews, K. L. Karr, J. Warren McCaffrey, McCarthy & Toomey, Joseph McCormack, Arthur F. McCormick, Walter E. McCornack, McDonald & Taylor, McNab, Holmes & Long, Joseph Mendelsohn, Benjamin S. Mesirow, Creighton S. Miller, Miller, Zeiss, Bengel & Lavery, Matthew

Mills, Charles J. Monahan, Montgomery, Hart, Pritchard & Herriott, Meyer Morton, Moses, Kennedy, Stein & Bachrach, Walter E. Moss, William B. Moulton, Thomas R. Mulroy, Arthur O. Graves, Nash & Ahern, H. Leo Neiburger, Arthur Wm. Nelson, Newby, Rathbun & Burditt, C. E. Newton, Nicholson, Snyder, Chadwell & Fagerburg, Sidney C. Nierman, Leslie M. O'Connor, David Olshan, Sanford Olson, Pam & Hurd, Dennis F. Parsons, Henry Perlman, Elbridge Bancroft Pierce, Pines, Stein & Beber, Pomeroy & Martin, Poppenhusen, Johnston, Thompson & Raymond, Millard R. Powers, Jess S. Raban, Hyman Reeder, William S. Riegelhaupt, Joseph Rolnick, H. J. Rosenberg, Myer N. Rosengard, Rosenthal, Hamill & Wormser, Ross & Watts, Isaac S. Rothschild, Julian C. Ryer, Julius Ruben, Rubenstein & Becker, Joseph S. Rubenstein, Sanders, Childs, Bobb & Westcott, Edgar J. Schoen, Schuyler, Weinfeld & Hennessy, Schwartz, Welfeld & Perlman, A. A. Schwarzbach, Scott, MacLeish & Falk, Seago, Bradley & McRoy, Julius H. Selinger, Seyfarth & Atwood, Lester B. Shafton, Shulman, Shulman & Abrams, Joseph G. Slottow, Ben M. Smith, Socrates, Davis & Cohen, Sonnenschein, Berkson, Lautmann, Levinson & Morse, Spencer & Bryan, S. Sidney Stein, Silber, Isaacs, Clausen & Woley, Lewis A. Stebbins, Stebbins, McKinley & Price, Oscar D. Stern, Stephen J. Sullivan, Sims & Stransky, Felix J. Streyckmans, Swanson, Dodge & Bremner, Peter J. Tatooles, Clarence C. Taylor, Taylor, Miller, Busch & Boyden, Tenney, Harding, Sherman & Rogers, H. M. Tenny, Sidney Z. Tepper, Theodore J. Isaacs, C. M. Thomson, Townley, Wild, Campbell & Clark, C. E. Tripp, Gerald Turnbull, Frank L. Tuttle, Ungaro & Sherwood, John E. Van Natta, Albert H. & Henry Veeder, Wadsworth Watts, Herman Waldman, Watkins & Ten Hoor, Weber, Miller & Deffenbaugh, Leonard A. Weinberg, Maurice Weissman, Wetten, Pegler & Dale, Leslie H. Whipp, White & Hawxhurst, Walter E. Wiles, Wilhartz, Hirsch & Schanfarber, William H. Winslow, Jr., Wilson & McIlvaine, Winston, Strawn & Shaw, C. V. Wisner, Jr., S. R. Wittelle, F. Philip Young, and Zane, Morse, Zimmerman & Norman, all of Chicago, Ill., James E. Burke, of Joliet, Ill., Healy & Beverly, of Elgin, Ill., Perkins & Battle, of Charlottesville, Va., and Alphonse G. Riesenberg, of Cincinnati, Ohio, for defendants.

WILKERSON, District Judge.

### Findings of Fact.

The court finds the facts as follows:

Plaintiff was incorporated by Act of January 22, 1932 (chapter 8, 47 Stat. 5, see 15 U.S.C.A. § 601 et seq.).

Defendant bank was organized under Illinois law on July 25, 1931, with paid up capital stock of $14,000,000, divided into 140,000 shares of the par value of $100 per share.

The condition of the bank on July 25, 1931, was as follows: Loans, $154,243,421.45; cash, including amounts due from other banks, $62,839,335.08; deposits, $240,746,647.25. The condition of the bank on June 25, 1932, was as follows: Loans, $101,016,512.33; cash, $18,620,916.84; deposits, $127,686,092.82.

During the month of June, 1932, defendant bank lost deposits at a rapidly increasing rate. From the close of business on June 1, 1932, to the close of business on June 25, 1932, deposits decreased from $147,688,097.62 to $127,686,092.82. From the close of business on June 20, 1932, to the close of business on June 25, 1932, deposits decreased from $141,238,322.88 to $127,686,092.82. On June 25, 1932, deposits decreased in the amount of $4,618,523.15.

Charles G. Dawes became a member of plaintiff's board of directors on February 2, 1932. He tendered his resignation as director on June 6, 1932, and on June 8, 1932, the resignation was accepted effective at the close of business on June 15, 1932.

Shortly prior to June 25, 1932, defendant bank applied to plaintiff for a loan of $16,000,000. Plaintiff sent examiners to make an examination of the collateral to be offered as security for the loan, and the examiners commenced to make the examination. It became apparent, however, that a larger loan would be required, and the examination was temporarily discontinued. The investigation of collateral by the examiners was not completed until after July 7, 1932.

On June 25, 1932, plaintiff's board of directors by resolution approved a loan of $16,000,000 to the bank. The loan was to be payable six months from date, with interest at 5½ per cent. per annum, payable at maturity, on the note of the bank in the form prescribed by the corporation,

and upon delivery to the Federal Reserve Bank of Chicago, as custodian, of collateral valued at $31,099,000.

On June 27, 1932, at 1 a. m., there was a meeting of the stockholders of defendant bank, at which Charles G. Dawes was elected a director. There was a special meeting of the board of directors at 1:15 a. m. on the same day at which Charles G. Dawes was elected chairman of the board. The chairman stated that it was desirable and in the interests of the bank, its depositors and stockholders, to apply for a loan from the Reconstruction Finance Cor-

poration, and explained fully the reasons for such action. The board adopted resolutions authorizing the officers of the bank, among other things, to borrow from plaintiff or others, a sum not to exceed $95,000,-000, and to pledge with plaintiff any collateral which might be required as security for the loan.

On June 27, 1932, between 2:30 and 4 a. m., the bank executed and delivered to plaintiff an application for a loan of not more than $95,000,000, in the form prescribed by the plaintiff and submitted by it to the board of the bank.[1]

---

[1] The application provided in part as follows:

"Central Republic Bank and Trust Company (hereinafter called the applicant), a Bank organized and existing under the laws of Illinois, and having its principal place of business at Chicago, Illinois, hereby applies to Reconstruction Finance Corporation (hereinafter called the Corporation) for a loan not to exceed in the aggregate $95,000,000, to mature on or before December 24, 1932 and to be secured by collateral listed in Schedule F hereto attached, or other collateral acceptable to the Corporation. For the purpose of obtaining such loan the applicant represents and agrees as follows:

"(1) The loan herein applied for is desired for the purpose of paying existing bills payable and to increase cash reserves. * * *

"(3) Applicant will promptly upon demand deposit with the Corporation such additional collateral and further assurances, acceptable to or required by the Corporation, as it from time to time shall, in the exercise of its uncontrolled discretion, require for the full and adequate security of any and all indebtedness of the applicant to the Corporation. Collateral securing any indebtedness of the applicant shall be security for any and all other indebtedness of the applicant to the Corporation whether incurred under this application or otherwise, and whether now due or hereafter to become due, and whether heretofore or hereafter contracted. * * *

"(5) The Corporation, at its discretion, may collect and at the expense and in the name of applicant, or otherwise, enforce the payment when due of any or all collateral security held hereunder, by suit or otherwise, may surrender, compromise, release, renew, extend, or exchange all or any thereof, and may apply the net proceeds thereof to the payment of any item of indebtedness of the applicant to it. The applicant will pay or

cause to be paid to the Corporation all expense which the Corporation may incur in connection with this loan for the collection and/or enforcement of the obligations of the applicant, including the enforcement of any guaranty which the Corporation may hold in connection with the applicant's obligations to the Corporation, even though no foreclosure or other legal action take place. The applicant will pay or cause to be paid promptly when due all taxes, insurance premiums, warehouse charges, transportation costs, and other expenses necessary for the enforcement, preservation and/or protection of any security pledged hereunder, including fees for filing and recording mortgages and the like, or assignments thereof required by the Corporation. If the applicant fail to make any payment required in the preceding provisions of this paragraph, the Corporation is authorized to do so and shall have a lien upon all collateral held by it until it shall have been fully reimbursed for any advance which it may have made in payment of any such items, together with interest thereon at the rate of 6 per cent per annum. * * *

"(6) Upon any failure of the applicant to comply with any provisions of this application or default in the payment of any indebtedness to the Corporation or in case a receiver or liquidator is appointed for the applicant or any of its property, or in case of adjudication of insolvency, or assignment for benefit of creditors, the Corporation is authorized to declare any or all indebtedness of the applicant to the Corporation due and payable forthwith, and the same shall thereupon become so due and payable. And in case of any such default, the Corporation is authorized to sell, assign, and deliver the whole or any part of the collateral held by it from the applicant and any substitutes therefor or additions thereto, and any guarantee held by the Corporation in connection with the applicant's obligations, at any public or

Defendant bank delivered with the application to plaintiff its note, dated June 27, 1932, for $95,000,000, payable to plaintiff's order on or before December 24, 1932, at the Federal Reserve Bank of Chicago, with interest at 5½ per cent. per annum.

The note contains provisions pledging collateral, authorizing its sale and the application of the proceeds to the payment of the note and of any indebtedness of the bank to plaintiff, as plaintiff shall deem proper, and authorizing the collection or conversion of the collateral and the application of the proceeds to the payment of the note or any other indebtedness of the bank, whether due or not, in such manner as plaintiff shall choose.

Defendant bank also delivered, with the application, a statement dated June 27, 1932, signed by H. P. Preston, manager of plaintiff's Chicago Loan Agency, George M. Reynolds and M. A. Traylor, members of plaintiff's local advisory committee, and W. R. Milford and Ralph Buss, examiners of plaintiff, as follows: "Based upon the information which we have received we believe the proposed loan in the amount of $95,000,000 (Ninety-five Million Dollars) to Central Republic Bank and Trust Company, Chicago, Illinois, of which The Reconstruction Finance Corporation is lending $90,000,000 and others, $5,000,000 to be fully and adequately secured, the security to be of a face or book value of approximately $118,000,000 and including all the assets of the bank."

Before the delivery of the application, note, and statement, plaintiff's examiners obtained information concerning the bank, which was communicated by telephone to its board of directors in Washington, and to Jesse H. Jones and Wilson McCarthy, members of the board who were present at the bank during the night of June 26, 1932, and the morning of June 27, 1932. The examiners had conversations with Philip R. Clarke, president of the bank, as to the liability of the stockholders. Mr. Clarke stated to the examiners that the liability of the stockholders was worth between $7,-

---

private sale without demand, advertisement, or notice of the time or place of sale or adjournments thereof, for such price as it may deem fair, the undersigned hereby waiving any and all equity or right of redemption whether before or after sale hereunder, and upon such sale, the Corporation may become the purchaser of the whole or any part of such collateral free from any such right or equity of redemption. In case of any such sale, after deducting all costs, attorneys' fees, and other expenses of collection, the Payee or holder may apply the residue of the proceeds of such sale or sales to the payment of any or all indebtedness of the applicant to the Corporation and any balance remaining shall be paid to the applicant.

"Without limiting or affecting such rights of the Corporation so to sell part or all of such collateral, the Corporation is further authorized at its option and in its discretion to collect or cause to be collected or otherwise converted into money any part of the collateral held hereunder, by suit or otherwise, and is authorized in such case to surrender, compromise, release, renew, extend, or exchange any item of such collateral without prior notice or consent of the applicant. Proceeds of collections so made, after first deducting costs, attorneys' fees and expenses of collection, shall be applied to the payment of the indebtedness of the applicant to the Corporation whether due or not. In the event of any legal proceedings all costs and reasonable attorneys' fees incurred by the Corporation shall become a part of the indebtedness of the applicant covered by the provisions hereof. * * *

"(10) The applicant expressly reserves the right to anticipate the payment of any indebtedness to the Corporation incurred under this or any other application, but agrees that any payment so made by it may be applied upon any item of its indebtedness to the Corporation in such order as the Corporation may elect. * * *

"(15) In case a loan is made hereunder, this application and any conditions imposed by the Corporation in granting the loan shall be and become a contract between the applicant and the Corporation, which shall be binding upon and inure to the benefit of their successors and assigns."

Attached to the application as parts thereof were a copy of the resolution of the board of directors relating to the loan, certificate of election of the officers of the bank, statement of its financial condition, specimen note to be executed and schedules of collateral to be delivered. The collateral security to be given was described as follows: "All assets of the bank, excepting items on applicant's balance sheets, comprising 'total cash means.'" The total cash means referred to in the application were stated to be $18,620,916.84 at the close of business on June 25, 1932.

000,000 and $8,000,000. The estimate of the amount which could be realized from the liability of stockholders was not included in the valuation of $118,000,000 placed upon the assets of the defendant bank in the statement of Mr. Preston and others, delivered with the application. That estimate was in the information submitted to plaintiff's directors and to Mr. Preston and others before the statement as to the adequacy of the security was signed. On June 29, 1932, plaintiff's examiners sent to plaintiff's Washington office a preliminary report of the information obtained during the examination of the defendant bank. That report contained the following: "In considering the available security, it was recognized that stockholders' liability on capital of $14,000,000 is probably good for $7,000,000."

In the final report made by the examiners to plaintiff's board of directors on July 12, 1932, there is the following: "Mention is here made of the liability of stockholders with reference to the $14,-000,000 capital stock. This liability is believed to be good at this time for (at) least 50%." Before the final report of the examiners was sent to Washington the part relating to the liability of stockholders was called to the attention of the chairman of the board of defendant bank, who stated that many of the stockholders would be able to pay their liability.

The Federal Reserve Bank of Chicago acted as depositary, custodian, and fiscal agent for the plaintiff. On June 25, 1932, plaintiff by telegram instructed its fiscal agent to disburse $16,000,000 to the defendant bank. .

On June 27, 1932, at 8 a. m., defendant bank delivered to the Federal Reserve Bank its note for $10,000,000. The note was in the same form as the one for $95,-000,000, which had been delivered earlier in the day. The Federal Reserve Bank at once disbursed to defendant bank the sum of $10,000,000, which was credited to its account with the Federal Reserve Bank. At the same time the $95,000,000 note of defendant bank was returned to the bank by the plaintiff and never became an effective obligation of the maker.

On June 27, 1932, at 9:15 a. m., there was a special meeting of plaintiff's board of directors called, according to the recitals in the minutes, "to consider particularly a serious situation confronting the Central Republic Bank and Trust Company of Chicago." It was stated in the minutes of the meeting that General Dawes, representing the bank, had informed the corporation that the bank could not open its doors unless a loan could be arranged, and that General Dawes had assured the board that the loan applied for was for current requirements, including the payment of deposits, in order to keep the bank open, and not in contemplation of liquidation.[2]

The statement of Mr. Preston and others as to the adequacy of the collateral was presented to the board and the board amended the resolution of June 25, 1932,

[2] The portions of the minutes on this subject are as follows:

"Through the interchange of the long distance telephone conversations mentioned, the members of the Board were informed of the serious aspects of the situation. General Charles G. Dawes, representing the bank, advised the Corporation of the withdrawals of deposits during the past week, the nervousness of depositors, not only of this bank but also of banks generally in Chicago and the fear that withdrawals might be continued on a large scale. He informed the Corporation that unless the bank could arrange loans, to be available as needed, in sufficient amount to meet its current requirements, including the payment of deposits, the institution would not open its doors this (Monday) morning.

"The situation thus outlined presented to the members of the Board a grave emergency, affecting not only the bank concerned, but also the other banks of Chicago, the city of Chicago—the second largest in the United States—and the national interest. Honorable Anton Cermak, Mayor of Chicago, who appeared before the Board on June 21, at the head of a delegation, as recorded in the minutes of the meeting on that date, had advised the Board that the city had been unable to pay the salaries of its employees and other obligations for a long time, was unable to pay them now, could not obtain further credit from banks, and that public sentiment was such that he would not be responsible for the enforcement of law and order in the city unless relief came from some source.

"From all reports received by the Board, it seemed obvious that the closing of a bank as large as the Central Republic Bank and Trust Company would greatly aggravate the tense situation in Chicago and, because of the size and importance of the bank and the city,

by increasing the amount of the loan to $90,000,000.[3]

A telegram to the Chicago Loan Agency containing the substance of the resolution was then authorized by the board and sent.

The board instructed its secretary to send to Charles G. Dawes the following telegram: "Relying your assurance already given that loan applied for is for current requirements and to keep bank open and not in contemplation of liquida-

would cause repercussions which would be far reaching, and further impair public confidence throughout the country.

"In these circumstances, it was the view of the members of the Board that the bank should be saved from closing and enabled to continue in business, if this could be possibly accomplished with the assistance of the Corporation under the authority of the law.

"It developed in the long distance telephone conversations referred to that the bank felt it must have, if it was to remain open, loans in the aggregate amount of Ninety-five Million Dollars ($95,000,000). The loans would be secured by all the assets of the bank aggregating One Hundred Eighteen Million Dollars ($118,000,000). It was proposed that the Corporation participate in the loans to the extent of Ninety Million Dollars ($90,000,000)' (including the loan of Sixteen Million Dollars ($16,000,000) which was approved on June 25), Chicago banks loaning the remaining Five Million Dollars ($5,000,000). The members of the Board were advised that H. P. Preston, Manager of the Chicago Loan Agency; George M. Reynolds, Chairman, and M. A. Traylor, Member, of the Advisory Committee of the Chicago Loan Agency; and W. R. Milford, Assistant Chief, Examining Division, and Ralph H. Buss, member of the examining force of the Washington office, who are in Chicago, would execute a certificate with respect to the collateral to the effect that, upon the basis of the information which they had received, they believed the proposed loans in the amount of Ninety-five Million Dollars ($95,000,000), of which the Reconstruction Finance Corporation would lend Ninety Million Dollars ($90,000,000), would be fully and adequately secured by the collateral having a face or book value of One Hundred Eighteen Million Dollars ($118,000,000).

"General Dawes assured the members of the Board by telephone last night that the loan applied for is for current requirements, including the payment of deposits, in order to keep the bank open and not in contemplation of liquidation.

"Secretary Mills reported to the meeting that Directors Jones and McCarthy, who, as stated above, are on the ground, had said to him over the long distance telephone last night that they unequivocally recommended the loan. Secretary Mills

further stated that he was informed that the loan also was recommended by Messrs. Preston, Reynolds, Traylor, Milford and Buss, who will sign the statement with respect to the adequacy of the collateral."

[3] The resolution is as follows:

"Resolved, That the resolution adopted by the Board of Directors on June 25, 1932, approving a loan to Central Republic Bank and Trust Company, Chicago, Illinois, Docket No. 5271, in the amount of Sixteen Million Dollars ($16,000,000), payable six (6) months from date, with interest at the rate of five and one-half per cent (5½%), per annum, payable at maturity, on the note of said bank, in form prescribed by this Corporation, upon delivery to the Federal Reserve Bank of Chicago, as Custodian for the Corporation, of said note, and of the following collateral:

Bonds and other securities...$ 7,500,000
Real Estate Mortgage Notes.. 999,000
Secured Notes.............. 18,800,000
Unsecured Notes............ 3,800,000

and upon the conditions stated therein, be amended by increasing the amount of said loan to Ninety Million Dollars ($90,000,000), such loan to be disbursed by the Custodian in the following manner and upon the following conditions:

"A. Thirty Million Dollars ($30,000,000), which shall include the loan of Sixteen Million Dollars ($16,000,000) approved by the resolution of the Board of Directors adopted on June 25, 1932, to be disbursed to the applicant as needed, upon receipt by the Custodian of the following:

"(1) Applicant's note or notes, in form prescribed by this Corporation, in the aggregate amount of Thirty Million Dollars ($30,000,000);

"(2) Collateral having an aggregate face amount of not less than Forty Million Dollars ($40,000,000), including the equity in approximately Sixteen Million Dollars ($16,000,000), of the applicant's collateral above described, which collateral is now pledged with certain New York banks;

"(3) Certificate signed by Agency Manager, George M. Reynolds, Melvin R. Traylor, W. R. Milford, and R. H. Buss, in substantially the following form:

"Based on the information which we have received, we believe the proposed loan in the amount of Ninety-five Million Dollars ($95,000,000) to Central Re-

tion Corporation has wired Custodian instructions regarding loan." To this General Dawes replied by wire as follows: "Your telegram received. Am glad to know that relying upon my assurance already given that loan applied for is for current requirements and to pay depositors in order to keep bank open and not in contemplation of liquidation that Corporation has wired Custodian instructions regarding loan."

The telegrams were made a part of the minutes of the meeting of the board. The board approved the action of the treasurer on June 25, 1932, in authorizing the Federal Reserve Bank to accept collateral on its count and check instead of that of the manager of the loan agency.

On June 27, 1932, defendant bank delivered to the Chicago Loan Agency its note for $30,000,000 in form the same as those theretofore executed by it. On June 29, 1932, that note was transmitted to the Federal Reserve Bank with a letter signed by the assistant manager of the agency, in part as follows:

"I hereby certify that the attached Exhibit E, primary obligation of the above named applicant [i. e., said $30,000,000 note], is in proper form and applies to loan from the Reconstruction Finance Corporation which the Board has approved for $90,000,000.00 subject to conditions, if any, stated in the Treasurer's telegraphic or mailed advice of approval. Washington telegraphic advice of approval contains the condition that $30,000,000.00 shall be available to said bank against delivery of certificate signed by Agency Manager, Reynolds, Traylor, Milford and Buss, as follows: * * *

"The above condition has been complied with.

"Washington telegraphic approval also further states that advance in excess of $30,000,000.00 and up to $90,000,000.00 conditioned upon agreement satisfactory to Agency and Agency Counsel providing for participation in loan of other banks, Chicago, $5,000,000.00, in total of $95,000,000.-00, on understanding they also approve collateral that we have control of handling thereof.

"The agreement referred to above is in your possession and has been duly approved by the Agency Manager and Agency Counsel.

"In keeping with the authority contained in Leach's telegraphic advice of approval, you are authorized to advance proceeds as needed in the sum of $30,000,000.-00, as per directions of the applicant, upon the condition that you have under your control not less than $60,000,000.00 face' amount of sundry collateral, including $10,-000,000.00 equity in collateral now pledged with certain New York Banks, against which you hold a proper assignment."

The words "Washington telegraphic advice of approval," "Washington telegraphic approval" and "Leach's telegraphic advice of approval" in this letter referred to the telegram of June 27, 1932, authorizing the disbursement of the entire $90,-000,000 loan.

On June 29, 1932, plaintiff disbursed to the defendant bank the additional sum of $30,000,000, which was credited to its account at the Federal Reserve Bank.

On June 29, 1932, a satisfactory agreement for a loan of $5,000,000 by the Chi-

---

public Bank and Trust Company, Chicago, Illinois, of which Reconstruction Finance Corporation is lending Ninety Million Dollars ($90,000,000) and others Five Million Dollars ($5,000,000), to be fully and adequately secured, the security to be of a face or book value of approximately One Hundred Eighteen Million Dollars ($118,000,000), and including all the assets of the bank.

"B. Sixty Million Dollars ($60,000,000) to be disbursed to the applicant as needed, upon delivery to the Custodian of—

"(1) Collateral, identified by the Manager or Acting Manager of the Loan Agency as having an aggregate face or book value of approximately One Hundred Eighteen Million Dollars ($118,000,-000), (including the Forty Million Dollars ($40,000,000) of collateral described in

paragraph A (2) of this resolution), which shall include all of the assets of said applicant;

"(2) A duly executed agreement, in form and substance satisfactory to the Manager or Acting Manager of the Loan Agency and to Agency Counsel, providing for participation by other Chicago banks to the extent of Five Million Dollars ($5,000,000) in the aggregate loan of Ninety-five Million Dollars ($95,000,000) to be made to the applicant, which agreement shall state that such participating Chicago banks also approve the collateral tendered as security by the applicant, and a specific agreement on the part of such participating banks that the Corporation shall have control of the administration and handling of all of the pledged collateral; * * *"

cago banks, as required by the resolution of plaintiff's board, adopted June 27, 1932, was delivered to the fiscal agent of plaintiff, and on July 13, 1932, the Chicago banks disbursed to defendant bank a part of the $5,000,000 proportionate to the amount advanced by plaintiff out of the authorized $90,000,000 loan.

On June 29, 1932, defendant bank requested an additional disbursement of $30,000,000 on the loan, and delivered to plaintiff's loan agency another note for $30,000,000, dated June 27, 1932, in the same form as the other notes executed by it. The note was sent to the Federal Reserve Bank with a letter which was the same as the one with which the other $30,000,000 note was transmitted with the exception of the last paragraph. For that paragraph was substituted the following: "An original disbursement of $10,000,000.00 was made June 27 and a supplemental disbursement of $30,000,000.00 has been previously authorized on this date. In keeping with the authority contained in Leach's telegraphic advice of approval you are authorized to advance an additional $30,000,000.00 as per directions of the applicant, upon the condition you have under your control not less than $80,000,000.00 face amount of sundry collateral, including $10,000,000.00 equity in collateral now pledged with certain New York Banks against which you hold a proper assignment."

On June 29, 1932, the Federal Reserve Bank disbursed an additional $30,000,000 on the loan and placed the same to the credit of the defendant bank. This disbursement resulted in an overdraft of the account of the United States Treasury with the Federal Reserve Bank, and on June 30, 1932, plaintiff's board adopted the following resolution: "Resolved that it is the sense of this Board that the Central Republic Bank and Trust Company, Chicago, Illinois, should return $30,000,000 of the total of $70,000,000 indebtedness without release of collateral and upon such return the accounts between the Central Republic Bank and Trust Company and this Corporation be adjusted as the Treasurer may arrange so that the remaining balance of $50,000,000 of the loan heretofore authorized may be disbursed as provided in the resolutions of the Board and on conditions prescribed therein. It is the intention that this transaction is in no way a repayment of any money advanced but is a deferring of the advance of said $30,000,000 for the better convenience of the parties."

On June 30, 1932, defendant bank sent to the Federal Reserve Bank the following:

"For the better convenience of the parties and at the instance of the Reconstruction Finance Corporation, we have determined to defer acceptance of the most recent $30,000,000 arranged to be provided on the loan application and commitment of June 27, 1932.

"You are accordingly authorized to take such steps as may be necessary to effectually provide that this particular $30,000,000 is held by you for the account of the Reconstruction Finance Corporation.

"The result of this will be that we are still entitled to receive from the Reconstruction Finance Corporation and its participants the balance of $55,000,000.

"For the convenience of the parties you will hold the note referring to the above $30,000,000 as against the future advance of same amount to us."

On June 30, 1932, the second credit of $30,000,000 to the defendant bank on the books of the Federal Reserve Bank was reversed by debiting the bank's account with $30,000,000 and crediting the account of the Treasury with the same amount. The defendant bank paid interest for one day on said amount of $30,000,000.

After the approval of the $90,000,000 loan the deposits of the bank continued to decrease, until by July 13, 1932, they had gone down to about $100,000,000. The bank had a rental liability of $780,000 a year. The collateral pledged by the bank for loans yielded 4⅝ per cent. per annum, and the bank was obligated for 5½ per cent. per annum on the loans. In view of these expenses it could not continue to operate except at a great loss without a large increase in its deposits. The attempt to restore the standing of the bank and to bring its deposits up to a point where it could continue to operate without loss had failed.

On July 13, 1932, Owen D. Young appeared at a meeting of plaintiff's directors on behalf of defendant bank. He reviewed the condition of the bank and proposed a plan to meet the difficulties which confronted the bank. The plan included the organization of a new bank, the taking over by the new bank of the deposit lia-

bilities of the old, with cash enough to cover the deposit liabilities and the purchase by the new bank of a part of the collateral pledged by the old bank as security for its loans.[4]

On July 19, 1932, plaintiff's board of directors sent one of its attorneys to Chicago to investigate all aspects of the proposed plan for the organization of a new national bank to take over the deposit liabilities of the defendant bank. It was understood that he would make no commitments on behalf of plaintiff.

On July 22, 1932, plaintiff's board of directors approved the action of the loan agency in releasing to the defendant bank

[4] The minutes of the board on this subject are as follows:

"Owen D. Young appeared before the Board to discuss the situation confronting the Central Republic Bank and Trust Company, of Chicago, Illinois. He said he desired, first, to advise the Board that he had no personal interest whatever in the matter except his personal friendship for General Dawes, who had asked him to come to Chicago and spend the week-end with him. He stated that he had gone into a partially developed plan which the bank had in mind and which, it was thought, would relieve the situation. He felt that it was obvious that General Dawes could not go ahead in developing the plan without the Board of Directors of the Reconstruction Finance Corporation at least knowing about the matter, and, therefore, General Dawes had asked him to put the situation before the Board.

"Mr. Young stated that he had asked Mr. Preston, Manager of the Chicago Loan Agency of the Corporation, to come with him to Washington because of his familiarity with the subject. He said that his understanding of the situation was: (1) That the collateral pledged by the bank for loans of $95,000,000 ($90,000,000 by the Corporation and $5,000,000 by Chicago banks) yields 4⅝% interest per annum, while the bank pays 5½% interest per annum on the loans, this difference in interest resulting in an accumulating deficit; (2) Having a rental liability of $780,000, the institution has an organization set-up for a bank of $300,000,000; its deposits have gone down to approximately $100,000,000. They have shrunk $27,000,000 added Mr. Young since the Board's commitment was made. It was quite obvious, therefore, he said, that, with deposits shrinking, seepage going on, with such a huge rental, and an organization altogether too large for the present size bank, each day means its surplus is going. Mr. Young stated that it was impossible for General Dawes to do anything to prevent this situation continuing and that, if it does continue, there is nothing ahead except liquidation of the bank, calling upon the Board for the undisbursed proceeds of the loan that has been authorized and paying out the funds to depositors.

"Mr. Young said that it was now suggested that a new National bank be organized with $4,000,000 of capital, if that amount could be found. General Dawes, he stated, was very apprehensive that he could not find that much, but felt that he could find $3,000,000. Mr. Young thought that General Dawes, in his present state of mind, probably underestimated his capacity to get capital for the new bank. Mr. Young said that if it were possible to find $4,000,000 in capital and organize a new National bank now, not taking over the personnel of the present bank, except the younger men who have demonstrated their capacity, and possibly having someone from the outside, in whom there would be complete confidence as President, and the old bank could be furnished by the Reconstruction Finance Corporation with the full amount of its commitment, the new bank then could take over the deposits of the old bank with cash enough to cover the deposit liability, so that the new bank would have X deposits against X in cash, and $3,000,000 or $4,000,000 in capital. The new bank, he added, then would, if the Board were willing, purchase from the Corporation between $20,000,000 and $30,000,000 of prime collateral pledged by the old bank as security for its loan, paying cash for such collateral at its face value. He thought that the new bank would not want to take anything over for which it could not pay face value. The result would be, he added, to diminish the Corporation's loan to the old bank from $90,000,000 to approximately $60,000,000 or $65,000,000. He pointed out that the ratio of the face value of collateral securing the loan in that amount would be much greater than the ratio of collateral supporting the $90,000,000 loan.

"Mr. Young expressed the opinion that the consummation of such a plan unquestionably would be a good thing from the standpoint of the situation in Chicago. He said there would be a new sound bank, which the banks in Chicago agree is needed and desirable in the present circumstances. If it was helpful from the Board's point of view, he felt it could be assumed that it would be helpful in Chicago, and, if the Board saw no objection to the proceeding, he would notify

collateral of the face value of $20,000,000. The manager of the loan agency stated that the release was necessary so that the bank could carry on its business and function as a bank.

On August 3, 1932, Henry M. Dawes and Harry B. Hurd, directors, and C. C. Haffner and Arthur T. Leonard, vice presidents of defendant bank appeared before plaintiff's board of directors. The minutes of the board contain the following: "Mr. Dawes, stressing the urgent nature of the matter, stated it was desirable to have the new bank start business with a large capital. He said that deposits of between $50,000,000 and $55,000,000 were reasonably assured, not counting secured deposits and corporate trusts. He felt that it would be unsafe for the new bank to make a commitment involving more than $15,000,000 with respect to loans to enable makers to take up paper held by the Corporation. The opinion was expressed by members of the Board that the new bank should ar-range to retire at least $35,000,000 worth of the collateral now held by the Corporation against its loan to the Central Republic Bank & Trust Company. Mr. Bogue raised the question as to whether the liability of the stockholders of the Central Republic Bank & Trust Company is preserved under the plan, and stated that the Legal Division would have to study the matter further, before expressing an opinion. The representatives of the bank thereupon withdrew from the meeting."

A committee consisting of four members of the staff of the corporation was appointed to confer further with the representatives of defendant bank, and report to the board. The committee made a report on August 4, 1932, and gave its opinion that the board would be justified in indicating that it had no objection to the plan provided certain conditions were satisfied.[5]

The minutes of the board do not show any action of the board on the report of the committee, and there is not any evi-

General Dawes at once to mobilize all his efforts and resources to see if he could get the capital for the new bank. Mr. Young said that the proposal could not be put in definite form until the new capital had been arranged for.

"Mr. Cowles asked what would happen to the present lease on the bank building, which amounts to $780,000 a year, and Mr. Young replied that General Dawes had an arrangement with the landlord that the new bank would be permitted to take over the large banking floor for $150,000 a year for two years.

"Mr. Bogue inquired if the plan would relieve the stockholders of the old bank of their stockholders' liability, and Mr. Young replied that it would not. It is the purpose of General Dawes, he added, to offer the stock of the new bank to the stockholders of the old bank on a pro rata basis.

"Mr. McCarthy said he assumed that it was Mr. Young's judgment that the bank would have to go into liquidation in any event. Mr. Young replied that in his opinion there was absolutely no question on that point.

"After general discussion of the matter, the Chairman advised Mr. Young that it would be necessary for the Board to have the General Counsel and Examining Division of the Corporation make a careful study of the proposal. The matter, he said, would be taken under advisement, and, in the meantime, it would not be possible for the Board to express any opinion with respect to the plan.

Thereupon, Mr. Young withdrew from the meeting."

[5] The minutes of the board are as follows:

"The Board considered the following memorandum presented by Messrs. Bogue, Talley, Paulger and McKee, the committee named at the afternoon meeting of the Board on August 3, to confer with representatives of the Central Republic Bank and Trust Company, Chicago, Illinois, with respect to a plan for the readjustment of its affairs looking to the better liquidation of the loan authorized by this Corporation and protection of its interests:

"Your committee has considered the proposed plan for a readjustment of the affairs of the Central Republic Bank and Trust Company. In the opinion of your committee the Board of directors would be justified in indicating that it had no objection to the consummation of the plan, provided the following conditions were satisfied:

"(1) That the new bank be organized with a capital and surplus of at least $5,000,000.

"(2) That the new bank undertake to loan to the makers of paper held by the Corporation amounts sufficient to permit such makers to take up paper held by the Corporation in an amount equal to 50 per cent of the deposits of the new bank as of its date of opening.

"(3) That the new bank agree to service the activities of the real estate loan and trust departments of the present bank

dence showing that the board ever considered the report again or took any formal action with reference to it.

On September 23, 1932, Mr. Clarke, the president, and Mr. Hurd, director and attorney for the bank, appeared before the board, and the following took place, as shown by the minutes:

"In reply to a question as to whether the new bank would purchase paper pledged with the Corporation to the extent of $25,000,000, with the result that the Corporation's loan would be reduced by that amount, Mr. Clarke replied in the negative, explaining that it had been previously stated that the new bank would purchase $15,000,000 of the paper and that it had also been suggested that other Chicago banks purchase $10,000,000 of the Corporation's collateral.

"Mr. Clarke stated that he did not now believe other banks of Chicago would take any of the paper of the Central Republic Bank and Trust Company, because, in their opinion, such action would be prejudicial to the best interests of the newly organized bank. He further pointed out that since the statement was made that the new bank would purchase $15,000,000 of the paper, there had been payments on it, so that the amount which would be purchased would be approximately $13,000,000.

"Mr. Hurd told the Board that, through the organization of the new bank, the Corporation would not lose any of its legal rights to proceed against the stockholders of the old Central Republic Bank and Trust Company in connection with their liability as stockholders.

"Mr. Clarke and Mr. Hurd thereupon withdrew.

"The Board further considered the questions involved in the liquidation of the Corporation's loan to the Central Republic Bank and Trust Company, but took no action."

The deposits of defendant bank were as follows: July 25, 1931, $240,746,647.25; June 30, 1932, $112,308,320.76; October 5, 1932, $72,208,817.60.

As a result of the disbursement by the plaintiff of $10,000,000 on June 27, 1932, and $60,000,000 on June 29, 1932, to the defendant bank, the cash, including money due from other banks, of the defendant bank, increased from $18,620,916.84 at the close of business on June 25, 1932, to $76,-448,754.62 at the close of business on June 29, 1932. Within those four days the deposits of the bank decreased in an amount in excess of $14,000,000. After the reversal of the second $30,000,000 credit on June 30, 1932, and as a result of continued

---

for the life of the loan from the Corporation, and that the aggregate net earnings of such departments and of the corresponding departments of the new bank be divided between the present bank and the new bank during such period on the basis of 40 per cent to the new bank and 60 per cent to the present bank.

"(4) That the New York bank creditors of the present bank and the Federal Reserve Bank of Chicago indicate their approval of the plan and agree that the collateral held by them will be liquidated in an orderly manner without sacrifice of the equities pledged to the Corporation.

"(5) That the new bank agree to service the administration and collection of collateral pledged to secure the loan from the Corporation, subject to its reimbursement for all out-of-pocket expenses including compensation paid to others than members of its regular staff involved in such service.

"(6) That the Central Republic Company (the securities affiliate of the present bank) agree to indemnify the Corporation from any loss which it may incur by failure to realize in full on the

stockholders' liability of stockholders of the present bank and further agree not to make any distribution to its stockholders during the life of the loan from the Corporation.

"(7) That the holders of a majority in number of shares of stock of the present bank approve the plan and agree to vote therefor and to use their best efforts to secure ratification of the plan by at least 2/3 of the total number of shares of stock of the present bank.

"(8) That the details involved in the satisfying of the foregoing conditions be carried out in a manner satisfactory to General Counsel of the Corporation.

"The committee pointed out that the old bank had approximately 7,500 stockholders, but that a relatively small number held a controlling interest. Mr. Cowles was of the opinion that all stockholders should have an opportunity to pass on the plan, and, in this connection, Mr. Bogue stated that stockholders who did not sign consent might undertake to resist suit to enforce stockholder's liability. After discussion of the matter, the Board deferred action for further consideration."

withdrawals of deposits, the cash, including money due from other banks, of the defendant bank declined to $43,949,673.14 at the close of business on June 30, 1932. From June 30, 1932, through October 5, 1932, this item of $43,949,673.14 decreased to $21,078,183.90.

At the close of business on July 25, 1931, the total resources of the defendant bank amounted to $277,933,760.26. At that time the bank had no bills payable outstanding and none of its resources were pledged. At the close of business on July 30, 1932, the total resources of the defendant bank decreased to $173,264,741.81. Of these resources, loans in the amount of $93,744,836.66, and investments in the amount of $33,969,933.70, or total resources in the amount of $127,714,770.36, were pledged at this time to secure bills payable and rediscounts in the amount of $47,678,587.07. Against deposit liabilities in the amount of $92,304,835.57, the defendant bank, at the close of business on July 30, 1932, had the following unpledged resources:

| | |
|---|---|
| Loans to customers | $ 1,666,688.90 |
| Real Estate Department loans | 67,634.84 |
| Overdrafts | 79,168.99 |
| Investments | 3,772,841.56 |
| Cash and due from banks | 27,687,291.96 |
| Acceptances of other banks sold | 1,246,560.20 |
| Customers liability a/c travelers checks, letters of credit and acceptances | 3,231,351.02 |
| Real Estate owned | 4,703,220.09 |
| Advances to trust department | 350,000.00 |
| Other resources | 2,745,213.89 |
| Total resources unpledged | $45,549,971.45 |

At the close of business on October 5, 1932, the total resources of the defendant bank had declined to $139,069,238.88. Of these resources, loans in the amount of $85,436,608.79 and investments in the amount of $19,186,768.61, or total resources in the amount of $104,623,377.40 were pledged at this time to secure bills payable and rediscounts in the amount of $38,270,174.59. Against deposit liabilities in the amount of $72,208,817.60, the defendant bank, at the close of business on October 5, 1932, had the following unpledged resources:

| | |
|---|---|
| Loans to customers | $ 4,374,156.33 |
| Real Estate Department loans | 110,225.29 |
| Overdrafts | 51,393.88 |
| Investments | 27,973.04 |
| Cash and due from banks | 21,078,183.90 |
| Customers liability a/c travelers checks, letters of credit and acceptances | 602,331.34 |
| Real Estate owned | 4,772,059.28 |
| Advances to trust department | 350,000.00 |
| Other resources | 3,079,538.42 |
| Total resources unpledged | $34,445,861.48 |

The defendant bank, by the terms of the resolution of plaintiff's board passed on June 27, 1932, was entitled, upon compliance with the terms of the resolution as to collateral, to an additional disbursement of $50,000,000.

As a result of decreased earnings and heavy interest charges accruing on its outstanding bills payable, the defendant bank operated at a substantial loss during the months of July, August, and September, 1932. During this period the income of the bank declined materially, primarily as the result of a substantial decrease in the interest and discount earned by the bank. For the month of June, 1932, the total income of the bank amounted to $703,449.22; for the month of July, $574,383.98; for the month of August, $591,606.88; and for the month of September, $486,454.42. Concurrently with this decline in income, the expenses of the defendant bank increased substantially. For the month of June, 1932, the total expenses of the bank amounted to $559,341.24; for the month of July, $743,296.92; for the month of August, $686,133.59, and for the month of September, $611,799.15. The increased expenses of the bank resulted from the payment and accrual of heavy interest charges on the outstanding bills payable of the defendant bank. For the month of June, 1932, interest accrued and paid amounted to $115,657.50; for the month of July, $297,962.48; for the month of August, $275,837.85; and for the month of September, $213,771.97. The combination of decreased income and increased expenses caused the defendant bank to change from a net profit of $144,107.98 for the month of June, 1932, to a net loss of $168,912.94 for July, 1932; a net loss of $94,526.71 for August, 1932; and a net loss of $125,344.73

for September, 1932. In view of the circumstances of the defendant bank, the plan for the reorganization of a new bank to take over its deposit liabilities was carried forward by its sponsors.

On September 29, 1932, the Federal Reserve Bank of Chicago returned to the defendant bank the second $30,000,000 note of that bank, delivered on June 29, 1932, with a letter to the defendant bank which read in part as follows: "In view of present developments it is evident that this instrument will not be used, and it is therefore returned for your files."

On September 28, 1932, defendant bank sent to the Federal Reserve Bank its note for $50,000,000 in terms as prescribed by the resolution of June 27, 1932, with a letter as follows:

"Pursuant to the agreement made under the loan application of the undersigned to the Reconstruction Finance Corporation dated June 27, 1932, we are handing you herewith our promissory note, payable to the order of Reconstruction Finance Corporation, dated October 3, 1932, maturing December 24, 1932, in the principal amount of $50,000,000, bearing interest at the rate of 5½% per annum payable at maturity.

"Please notify the Reconstruction Finance Corporation of the receipt by you of the aforementioned note of the undersigned and arrange to credit our account with the proceeds of the note on October 3, 1932."

On September 29, 1932, defendant bank requested the return of the $50,000,000 note in a letter to the Federal Reserve Bank, as follows:

"Referring to our letter of the 28th with reference to payment of the balance of the loan of the Reconstruction Finance Corporation to us, we will not need the balance of the loan earlier than October 5th and possibly not before the 10th of October.

"Accordingly it will be a sufficient compliance with our request to make such payment on October 5th or such later date as we may request. If you will return to us the note enclosed in our letter we will at the proper time substitute a new note bearing the proper date.

"You may advise the Reconstruction Finance Corporation accordingly."

The note was returned to defendant bank and never became an effective obligation of the maker.

On the afternoon of October 4, 1932, the organization papers of the City National Bank & Trust Company of Chicago were filed with the Comptroller of the Currency, and the certificate of the Comptroller was issued late in the day on October 5, 1932. The books of the City National Bank were opened on the morning of October 6, 1932.

At a special meeting of the directors of defendant bank at 2 p. m. on October 5, 1932, Charles G. Dawes, chairman of the board, Philip R. Clarke, president of the bank, and certain other directors resigned. Joseph E. Otis was elected chairman of the board. The board then passed a resolution authorizing officers of defendant bank to transfer to plaintiff any notes and securities pledged to plaintiff, in payment of all or any part of the loan from plaintiff and the Chicago banks. The board also authorized a lease of certain premises from defendant bank to the Central Republic Company. The payment of rent was to be secured by the pledge of 5,000 shares of the capital stock of City National Bank to be issued to Central Republic Company. The board further authorized the execution of agreements between defendant bank and plaintiff, whereby defendant bank should assign to plaintiff the rentals to be paid under the aforesaid lease, together with the security rights of defendant bank in said 5,000 shares of stock of the City National Bank, pledged by the Central Republic Company, as additional security for any indebtedness of defendant bank to plaintiff. The board of directors also passed a resolution, in which after reciting that "in view of existing conditions the Board of Directors of this Corporation deem it to be in the interests of this Corporation and its stockholders to enter into and carry out the agreement," the board authorized the execution of a contract between the defendant bank and the City National Bank, whereby the latter bank would agree to assume the deposit liabilities of the former in consideration for the payment of cash funds aggregating the amount of said deposit liabilities. The board also authorized the payment in cash to the City National Bank of the amount of the unsecured deposit liabilities to be assumed by the City National Bank. The board also authorized the execution of an agreement between defendant bank and the City National Bank, whereby the latter bank would supply office space and personnel for serv-

icing the real estate loan department and the trust department of the former bank.

Late in the afternoon of October 5, 1932, defendant bank mailed to all persons having commercial deposits with the bank the following notice:

"Effective tomorrow the Commercial, Savings and Checking-Savings Departments of this bank are being transferred to the City National Bank and Trust Company of Chicago.

"The new bank will be located in our present banking quarters at 208 South La Salle Street.

"Customers of these departments will experience no inconvenience in transacting their banking business as they will deal for the present with the same employees who have served them in the past. Checks drawn on the Central Republic Bank and Trust Company will be honored at the City National Bank and Trust Company.

"The services of our Trust Department and Real Estate Loan Department will be carried on by the Central Republic Bank and Trust Company as heretofore. Our Investment affiliate, Central Republic Company, will also continue its business in its present quarters as in the past.

"We are confident that the changes outlined above will assure for our customers a maintenance of a banking service of the calibre we have always sought to render."

On October 5, 1932, defendant bank sent to plaintiff's Chicago loan agency its note for $50,000,000, dated October 6, 1932, in terms, except as to date and amount, the same as the other notes made by defendant bank to plaintiff's order. The letter transmitting the note stated:

"Referring to our letters to Federal Reserve Bank of Chicago, of September 28, and September 29, 1932, we hereby advise you that we have need of the sum of Fifty Million Dollars ($50,000,000), being the undisbursed balance of the commitment of Reconstruction Finance Corporation to the undersigned.

"We therefore are herewith handing to you our new note payable to the order of Reconstruction Finance Corporation, dated October 6, 1932, maturing December 24, 1932, in the principal amount of Fifty Million Dollars ($50,000,000) bearing interest at the rate of five and one-half per centum per annum payable at maturity.

"Will you arrange to credit our account at the Federal Reserve Bank of Chicago with the sum of Fifty Million Dollars ($50,000,000), representing the proceeds of said note, on October 6, 1932."

On October 5, 1932, plaintiff's loan agency sent the note to plaintiff's fiscal agent, Federal Reserve Bank of Chicago, with a letter which stated:

"I hereby certify that the attached Exhibit E, primary obligation of the above named applicant, in the amount of $50,000,000.00 is in proper form and applies to loan from the Reconstruction Finance Corporation which the Board has approved for $90,000,000.00, subject to conditions, if any, stated in Treasurer's telegraphic or mailed advice of approval. Washington telegraphic advice of approval contains the condition that $30,000,000.00 shall be available to said bank against delivery of certificate signed by Agency Manager, Reynolds, Traylor, Milford and Buss. The above condition has been complied with.

"Washington telegraphic approval also further states that advance in excess of $30,000,000.00 and up to $90,000,000.00 conditioned upon agreement satisfactory to Agency and Agency Counsel providing for participation in loan of other banks, Chicago, $5,000,000.00, in total of $95,000,000.00 on understanding they also approve collateral, and that we have control of handling thereof.

"The agreement referred to above is in your possession and has been duly approved by the Agency Manager and Agency Counsel.

"Washington telegraphic approval further requires the Agency Manager or Agency Counsel to furnish to you, as Custodian, a certified copy of Resolution of Directors authorizing borrowing.

"This requirement has been complied with and the resolution is in your hands as a part of the formal application.

"An original disbursement of $10,000,000.00 was made on June 27, 1932, and a supplemental disbursement of $30,000,000.00 was made on June 29, 1932. In keeping with the authority contained in the Board's Resolution, as set out in Leach's telegraphic advice of approval, you are authorized to advance an additional $50,000,000 as per directions of the applicant."

The words "Washington telegraphic advice of approval", "Washington telegraphic approval" and "Leach's telegraphic advice of approval" in this letter referred to the

telegram of June 27, 1932, authorizing the disbursement of the entire $90,000,000 loan.

On October 6, 1932, between 7 and 8:15 a. m., the Federal Reserve Bank gave to defendant bank its check for $50,000,000, dated October 6, 1932. The check was indorsed at once and deposited to the credit of defendant bank at the Federal Reserve Bank before 8:15 a. m. There were no resolutions of plaintiff's board approving the disbursement other than those of June 27, 1932, set out above, and there is no evidence of any other action of plaintiff's board approving said disbursement.

At the same time on October 6, 1932, the four participating Chicago banks disbursed to defendant bank amounts aggregating $2,777,777.78. The draft of one of the banks was dated October 6, 1932; the drafts of the others were dated October 5, 1932. None of them was to be paid, and none of them was paid, until the delivery of the $50,000,000 check to defendant bank by plaintiff. The drafts were deposited to the credit of defendant bank in the Federal Reserve Bank.

As a result of the withdrawal of money by depositors and its inability to borrow from other banks on its collateral, defendant bank would have been obliged to close its doors shortly after June 25, 1932, if it had not been able to obtain the loan on its collateral which was made by plaintiff. The losses in the conduct of the business of defendant bank and the withdrawal of deposits, increased during July, August, and September, 1932; and the evidence clearly shows that if its deposit liabilities had not been transferred to another bank, defendant bank would have been obliged, within a short time, to close its doors and go into liquidation. The agreement for the assumption of depositors' liabilities became effective in the morning of October 6, 1932.[6]

The City National Bank at the opening of business on October 6, 1932, assumed all unsecured deposit liabilities and certain other current liabilities of defendant bank. Those liabilities were in the aggregate amount of $72,330,629.11. Defendant bank paid to City National Bank an amount of cash or cash items equal to the amount of such liabilities. The cash and cash items so paid included, among others, the $50,000,000 disbursed by plaintiff on October 6, 1932, the amounts contributed by the four Chicago banks on their loan, and about $9,300,000 representing the balance of the account of defendant bank with the Federal Reserve Bank of Chicago at the opening of business on October 6, 1932. Those amounts were represented by a draft for $62,121,060.14 drawn by defendant

---

[6] The agreement provides as follows:

"It being deemed by the parties hereto to be to their mutual advantage to enter into this agreement, it is accordingly agreed between the parties hereto as follows:

"1. The National Bank assumes and agrees to pay the existing unsecured deposit liabilities of the State Bank as is more particularly shown by the books of the State Bank as at the close of business on October 5th, 1932.

"2. The State Bank acknowledges itself indebted and bound to the National Bank for the aggregate amount of said deposit liabilities so assumed by the National Bank, and to enable the National Bank to pay said deposit liabilities on demand the State Bank agrees that it will, on the 6th day of October, 1932, or on such other date or dates as may be mutually agreed upon by the parties, pay and deliver to the National Bank cash funds aggregating the amount of deposit liabilities so assumed by the National Bank, said funds so delivered by the State Bank to the National Bank to be credited upon and extinguish its liability to the National Bank for the deposit liabilities so assumed, provided, however, that if any of the unsecured depositors of the State Bank shall refuse to accept payment from or the liability of the National Bank in satisfaction of their deposits in the State Bank the National Bank will forthwith notify the State Bank of that fact and will upon demand pay to the State Bank the amount of said unsecured deposits the payment of which has been so refused, so as to enable the State Bank to discharge and satisfy the same and thereby the National Bank shall be discharged from any liability with respect thereto. The term 'unsecured deposit liabilities' shall not include deposit liabilities payment whereof may be secured by pledged collateral but shall include deposit liabilities payment whereof may be secured by a surety or other similar bond.

"3. Nothing herein contained or otherwise shall constitute an assumption by the National Bank of, or in any way render the National Bank liable for, directly or indirectly, any obligations of the State Bank of any kind or character whatsoever other than the said deposit liabilities hereinbefore specifically assumed."

bank on the Federal Reserve Bank to the order of City National Bank. The draft was deposited in Federal Reserve Bank to the credit of City National Bank. None of the funds disbursed by plaintiff or the four Chicago banks on their loans was used to furnish capital or surplus of City National Bank.

On October 6, 1932, plaintiff purchased from defendant bank some of the collateral pledged to plaintiff and the four Chicago banks for their loan, and the plaintiff then sold the collateral so purchased to the City National Bank. The amount of such purchase was $15,051,201. Plaintiff made an appropriate credit for the amount of collateral purchased from defendant bank to the indebtedness of defendant bank and the four participating banks.

Early in the morning of October 6, 1932, defendant bank entered into an agreement with the City National Bank, whereby the latter bank agreed to supply office space and personnel for servicing the real estate loan department and trust department of defendant bank.[7]

The Central Republic Company was an affiliate of defendant bank, all of its stock being held by trustees for the pro rata benefit of the stockholders of defendant bank. Pursuant to the resolution hereinabove mentioned (p. 22) defendant bank leased to Central Republic Company certain premises in the building located at 134 South La Salle street, Chicago, Ill., including the ground floor, the main floor, one-half of the third floor and certain vault space in the basement. The lease was dated October 5, 1932, and was for a term commencing October 5, 1932, and ending October 14, 1938, with rent payable in the aggregate amount of $1,000,000 for the entire term. This lease was executed in the afternoon of October 5, 1932, and was delivered in the morning of October 6, 1932.

In accordance with the same resolution, the defendant bank entered into an agreement with the Central Republic Company whereby the latter company agreed to pledge 5,000 shares of the capital stock of the City National Bank as security for the lease of said premises at 134 South La Salle street. This agreement was dated October 5, 1932, and executed in the afternoon of October 5, 1932, and was delivered in the morning of October 6, 1932. In accordance with the same resolution the defendant bank entered into two agreements with the plaintiff assigning respectively the rentals under said lease with the Central Republic Company and the security rights

[7] This agreement provided:

"It being deemed to be mutually advantageous to the parties to enter into this Agreement, it is accordingly agreed between the parties hereto as follows:

"1. The National Bank agrees to service as agent of the State Bank the activities of the real estate loan and trust departments of the State Bank, and for that purpose agrees to provide the State Bank with office space and with personnel, by way of clerical and other help, (which personnel shall at all times be subject to the supervision and control of the Board of Directors of the State Bank) to enable it to continue to carry on the activities of said departments.

"2. For rendering such service the National Bank shall receive and/or retain 50% of the net earnings of such departments of the State Bank and of the corresponding departments of the National Bank, the remainder of such net earnings to go to the State Bank. Such net earnings shall be computed on the basis of a consolidated statement of said respective departments of the National Bank and the State Bank after deducting all costs of operation including the costs of rendering such service, as determined annually by a firm of certified public accountants, agreed upon between the parties, and in the event of their failure to so agree such firm shall be named upon application of either party and one day's notice to the other by the person who shall at the time be the Chairman of the Board of Directors of the Federal Reserve Bank of Chicago.

"3. Settlement shall be made between the parties on the 10th day of January, 1933, for the period commencing with the date hereof and ending on the 31st day of December, 1932, and quarterly thereafter during the life of this agreement, but such quarterly settlements shall be subject to adjustment in accordance with the annual determination of said firm of certified public accountants hereinbefore referred to.

"4. This agreement shall continue in force for the period of three years from the date hereof.

"5. Nothing herein contained or otherwise shall amount to an assumption by the National Bank of, or in any way render the National Bank responsible for, any liabilities incurred or to be incurred in respect of said departments of the State Bank or any of the activities thereof."

under said agreement pledging 5,000 shares of stock of the City National Bank, to the plaintiff "as additional security for all indebtedness now or hereafter owing by said Central Republic Bank and Trust Company to Reconstruction Finance Corporation." These agreements were dated October 5, 1932, were executed in the afternoon of October 5, 1932, and were delivered in the morning of October 6, 1932.

On, and a few days prior to, October 6, 1932, the plaintiff knew that the $50,000,000 which it was to disburse to the defendant bank on October 6, 1932, would be transferred to the City National Bank in consideration for the assumption by that bank of the deposit liabilities of the defendant bank. The following documents were prepared by Messrs. Pam and Hurd, as counsel for the defendant bank, and were approved, prior to their delivery, by counsel for the plaintiff: The agreement for the assumption by City National Bank of the deposit liabilities of the defendant bank; the lease dated October 5, 1932, between the defendant bank and Central Republic Company; the pledge agreement between the defendant bank and the Central Republic Company securing the payment of rentals under said lease; the assignments by the defendant bank to the plaintiff of the rentals under said lease and the security rights under said pledge agreement; the agreement between the defendant bank and the City National Bank for the servicing of the real estate loan department and the trust department of the defendant bank; the assignment of notes and securities from the defendant bank to the plaintiff; and the assignment of notes and securities from the plaintiff to the City National Bank. Messrs. Pam and Hurd also prepared the necessary papers for the organization of the City National Bank. These documents were not referred to counsel for the plaintiff but such counsel were assured by the morning of October 6, 1932, that the City National Bank had been duly organized.

On October 5, 1932, the directors of defendant bank sent to its stockholders a communication as follows:

"*. * *

"The nation-wide decline in bank deposits which culminated last June in a succession of local outlying bank failures, resulted in very heavy withdrawals from Central Republic Bank and Trust Company. The situation became so acute that to maintain adequate protection of depositors, it was necessary to borrow a substantial sum of money. While this restored the favorable cash position of the bank, it imposed a severe burden in the form of interest on the money borrowed.

"Drastic reductions had been made in overhead and salaries but the shrinkage in earning assets due to declining deposits was making it increasingly difficult to meet fixed rental obligations and other charges. Therefore when the cost of borrowed money was added to the other operating expense, the continuation of the Central Republic Bank and Trust Company without some readjustment could only have the effect of a steady impairment of its assets.

"The problem of how to remedy this uneconomic condition has for the past two months had the constant attention of your Board of Directors. Every effort was made to devise a plan that would retain intact the business of the bank. A careful analysis, however, of all of the factors involved, and particularly the high fixed rental charges, made it apparent that continued operating losses were inescapable and could only result ultimately in forced liquidation. This would have meant a sacrifice of the assets and would also carry the inherent threat of a stockholders' liability.

"Therefore it was finally concluded that the Central Republic Bank and Trust Company could only be enabled to remain in existence and proceed in orderly liquidation by divesting itself of its deposits and having them assumed by an outside and distinct institution.

"The deposits of Central Republic Bank and Trust Company have been taken over and assumed by City National Bank and Trust Company of Chicago, a newly formed bank with fully paid in capital and surplus of $5,000,000 ($4,000,000 capital and $1,000,000 surplus) provided by a syndicate organized for that purpose.

"As a collateral result of such action an advantageous settlement of certain other burdensome obligations of the bank was made possible. All of this is obviously in the best interests of the stockholders as it permits a realization of the assets to be made carefully during a prospective period of business recovery.

"Furthermore an agreement has been entered into with this new National Bank whereby it will service the administration of the Trust and Real Estate Loan Depart-

ments of Central Republic Bank and Trust Company upon a basis of divided earnings which is considered equitable. Therefore while the Central Republic Bank and Trust Company ceases to accept further deposits it will continue, with the assistance of the new National Bank, to operate its Trust and Real Estate Loan Departments and collect or realize upon its assets.

"Under the terms of the syndicate agreement whereby City National Bank and Trust Company of Chicago was organized, your Directors secured for the stockholders of the Central Republic Bank and Trust Company for sixty days the option to subscribe for the stock of City National Bank and Trust Company at the same price paid by the members of the syndicate—namely $125 per share. Thus in addition to the advantages of the orderly liquidation, the stockholders are also given the privilege of acquiring their proportionate interest in the new bank.

"Some suitable form of warrant evidencing the right to subscribe will be forwarded to all stockholders at an early date."

On October 18, 1932, the managers of the original syndicate which originally sub-

scribed for the entire capital of the City National Bank, sent to the stockholders of the defendant bank a notice that under the terms of the syndicate agreement they were entitled to purchase for cash one share of stock in the City National Bank for each 3½ shares of defendant bank; that the capital stock of the City National Bank was $4,000,000 with a surplus of $1,-000,000; that the price at which the stockholders were permitted to purchase stock of the City National Bank was $125 per share, the price paid by the syndicate for the shares acquired by it. Certain stockholders of the defendant bank purchased 123 shares of the capital stock of City National Bank. The Central Republic Company subscribed and paid for 11,200 shares of the 40,000 shares of the stock of the City National Bank, paying therefor the subscription price of $125 a share.

On October 20, 1932, notice was given to the stockholders of defendant bank of a stockholders' meeting to be held on November 19, 1932.[8]

At the meeting on November 19, 1932, 99,927 shares of the capital stock of defendant bank, out of a total of 140,000 shares, were represented either in person or by proxy.[9]

---

[8] The notice was as follows:

"Notice is hereby given that a special meeting of the stockholders of said corporation is hereby called and will be held at the office of said corporation, 208 South La Salle Street, in the City of Chicago, Illinois, on the 19th day of November, 1932, at the hour of 3:30 o'clock p. m., for the purposes of considering and acting upon:

"1. A proposal to decrease the number of Directors from fifty-two to twenty, and to take such action as may be necessary or appropriate to make such decrease effective;

"2. A proposal to change the name of the corporation to Central Republic Trust Company;

"3. A proposal to ratify any and all steps heretofore taken by the Board of Directors and/or officers of said corporation with respect to the readjustment of its affairs, including the arrangements heretofore made between said corporation and City National Bank and Trust Company of Chicago for the assumption by the latter of the deposit liabilities of this corporation and for servicing the activities of the real estate loan and trust departments of this corporation;

"4. Any other matters which may be submitted at such meeting with respect to

any or all of the property and affairs of this corporation.

"Dated, October 20, 1932."

[9] The proxy was as follows:

"Know all men by these presents that the undersigned stockholder of Central Republic Bank and Trust Company has made, constituted and appointed, and does hereby make, constitute and appoint, Joseph E. Otis, John A. Lynch and William R. Dawes, (or such of them, one or more, as may be in attendance), the true and lawful attorneys or attorney in fact of the undersigned for the undersigned and in the name, place and stead of the undersigned and as the proxy of the undersigned to vote the shares of stock of said corporation standing in the name of the undersigned or upon which the undersigned may be entitled to vote at the special meeting of the stockholders of said corporation to be held in the City of Chicago, Illinois, on the 19th day of November, 1932, and at any adjournment or adjournments thereof, hereby giving said attorneys or attorney in fact full power and authority at any such meeting or adjournment to vote upon any and all matters which may be submitted thereat, including particularly the matters referred to in the notice of

284

At this meeting by vote of 98,271 shares to 280 shares the following resolution was adopted:

"Be it resolved by the stockholders of Central Republic Bank and Trust Company that the stockholders of this corporation do hereby in all respects ratify, approve and confirm the action of the Board of Directors of this corporation in authorizing, and the action of the officers of this corporation in consummating, the following transactions in respect of the readjustment of the affairs of this corporation, to wit:

"(a) A transaction whereby on or about June 27, 1932 this corporation entered into an arrangement for a loan from Reconstruction Finance Corporation and certain Chicago Banks associated with it in such loan and did pledge as security for the repayment of such loan all or substantially all of the assets of the corporation existing at the time of such pledge other than the items in the balance sheet comprising 'Total Cash Means.'

"(b) A transaction consummated on or about the 6th day of October, 1932, whereby this corporation transferred to Reconstruction Finance Corporation, pursuant to an instrument of transfer entered into at that time, certain notes and securities in partial payment of said loan.

"(c) A transaction entered into on or about October 6, 1932 whereby pursuant to an agreement between the parties for that purpose City National Bank and Trust Company of Chicago assumed the deposit liabilities of Central Republic Bank and Trust Company against the payment by Central Republic Bank and Trust Company to City National Bank and Trust Company of Chicago of cash funds equal to the deposit liabilities so assumed.

"(d) A transaction entered into on or about the 6th day of October, 1932 whereby under an agreement entered into between the parties for that purpose City National Bank and Trust Company of Chicago undertook to service the activities of the Real Estate Loan and Trust Departments of Central Republic Bank and Trust Company for a period of three years upon a basis of fifty per cent of the net earnings of such Departments and of the corre-

sponding Departments of City National Bank and Trust Company of Chicago going to City National Bank and Trust Company of Chicago and the remainder thereof going to Central Republic Bank and Trust Company.

"(e) A transaction whereby on or about October 5, 1932 this corporation leased to Central Republic Company, for a term of years, certain space in the building owned by this corporation at 134 South LaSalle Street and assigned to Reconstruction Finance Corporation as security for this corporation's loan the benefits from time to time accruing to this corporation under such lease.

"(f) Transactions consummated on or about October 6, 1932 whereby certain leases in the loop district to Central Republic Bank and Trust Company and/or its predecessors as lessee were canceled.

"And do further in all respects ratify, approve and confirm all action of the officers and/or Directors of this corporation incident to or in furtherance of any of the foregoing transactions."

At the same meeting the offer of the City National Bank to modify the contract relating to the servicing by that bank of the real estate loan department and the trust department of defendant bank was modified so that the contract should be terminable at any time on or after six months from its date at the option of the defendant bank upon three months' notice to the City National Bank of such intended termination.

At the same meeting a resolution was adopted changing the name of defendant bank to Central Republic Trust Company, which change of name was approved by the Auditor of Public Accounts of Illinois, on November 26, 1932.

The names of defendants who, as stockholders, voted for or against the resolution approving the transactions with plaintiff and City National Bank & Trust Company are stated in Plaintiff's Exhibits 102, 102–A to 102–I, inclusive, 103 and 103–A to 103–BB, inclusive, which are made a part of these findings.

The agreement between defendant bank and City National Bank & Trust Company relative to the servicing of the trust

said meeting which bears date October 20, 1932, and all other matters in any manner germane thereto, all as fully as the undersigned could do if personally present, hereby ratifying and confirming all that said attorneys or attorney in fact may lawfully do by virtue hereof. * * *"

and real estate loan departments of defendant bank was modified early in 1933, and that contract as modified continued in force until October 6, 1935, after which date the trust department and real estate loan department of defendant bank were operated by the receiver of the defendant bank.

Defendant bank received deposits until the transfer of its deposit liabilities to City National Bank on October 6, 1932. Defendant bank did not receive any deposits after the morning of October 6, 1932. It had directors, officers, and employees after October 6, 1932. At the end of October, 1932, the bank had 19 officers and 85 other employees. At the end of October, 1934, there were 7 officers and 57 other employees. From October 6, 1932, until November 21, 1934, when a receiver was appointed for the defendant bank, the bank paid salaries to its officers and employees in the aggregate sum of $517,501.49. For the month of November, 1932, the total salaries paid were $36,007.73. For the month of October, 1934, such salaries amounted to $15,147.36.

For the month of October, 1932, defendant bank paid rent in the amount of $25,589.18. From January 1, 1933, to the end of November, 1934, the bank paid rent at the rate of $2,343.33 each month. The defendant bank retained its membership in the Federal Reserve system until after October 19, 1932.

The stockholders, board of directors, and executive committee of defendant bank continued to hold regular meetings after October 6, 1932. The stockholders held annual meetings in January, 1933, and January, 1934. The directors held regular meetings until October 5, 1934, and the executive committee held regular meetings until it was abolished early in 1934.

From October 6, 1932, until November 21, 1934, the commercial department of defendant bank was engaged in realizing upon, servicing and otherwise protecting its assets, most of which were pledged to the plaintiff and the four participating banks. The officers of defendant bank from time to time renewed commercial loans that had previously been made by the bank, and reported such renewals either to the board of directors or its executive committee. During this period defendant bank made regular commercial loans to persons already indebted to it for the purpose of enabling those persons to earn funds to pay their debts to the bank. The loans were made by officers of defendant bank, who investigated and approved the loans. The persons who renewed the commercial loans, and those who were engaged in realizing upon them, servicing and otherwise protecting the assets of the bank, were officers and employees of defendant bank. They were paid by defendant bank out of its operating fund, and none of them was paid by the City National Bank.

After October 6, 1932, the trust business of defendant bank was continued in accordance with the servicing agreements of City National Bank. Defendant bank had a trust investment committee composed of officers and one director of the bank. That committee had a secretary who presented reports concerning the investment of funds or changing of investments. The files of the trust department of defendant bank were kept in its vaults or in the custody of the officers of the trust department. City National Bank paid the salaries of employees of defendant bank in the trust department. Its officers and employees were also officers and employees of City National Bank, but, when working on trust accounts in defendant bank, they were responsible to the board of directors and the executive committee of defendant bank and not to the City National Bank. During this period, defendant bank qualified as executor under a will.

The real estate loan department of defendant bank carried on its full operations of servicing real estate items, collecting rents and interest and principal on mortgages for its clients until about March, 1933, when City National Bank took over that servicing under the agreements between it and defendant bank. Thereafter the real estate loan department operated in the same manner as the trust department. The officers of the real estate loan department were also officers of City National Bank. New loans were made by these officers on behalf of defendant bank under the authority of the board of directors. No loans were made with funds of defendant bank, but were made for the account of other persons, especially insurance companies. From March, 1933, until November 20, 1934, defendant bank continued to operate and service certain real estate assets which it owned.

After the transfer of deposit liabilities to City National Bank on October 6, 1932, defendant bank had remaining cash and

unpledged assets in the amount of about $5,000,000. These assets were used as an operating fund for the purpose of paying expenses of the bank. Under the agreements for servicing of the trust and real estate loan departments City National Bank paid to defendant bank between $9,000 and $12,000 each month from October 6, 1932, until November 21, 1934, as its share of the earnings of those departments. This income became part of the operating fund. On December 6, 1933, the operating fund of defendant bank amounted to approximately $4,000,000 in cash and unpledged assets.

Prior to October 6, 1932, defendant bank occupied a part of the building located at 208 South La Salle street, Chicago, Ill., under sixteen separate leases with an aggregate monthly rental of $73,600. The leases covering most of the space occupied by defendant bank did not expire until 1959. On October 6, 1932, all of these leases were canceled under an agreement with the lessor, and at the same time a new lease for about two-thirds of the premises occupied by defendant bank was made to City National Bank. After October 6, 1932, and until October 10, 1932, defendant bank and City National Bank together occupied the quarters at 208 South La Salle street leased by City National Bank under the new lease. After October 10, 1932, and until December 10, 1932, defendant bank occupied approximately 18,000 square feet of the first floor of the premises located at 208 South La Salle street, which had not been leased to and were not occupied during said period by said City National Bank.

In accordance with the provisions of the cancellation agreement, defendant bank paid rentals for the month of October, 1932, due to the lessor under the sixteen leases above referred to. Thereafter City National Bank reimbursed defendant bank for the proportion of the rental from October 6, 1932, to October 31, 1932. Defendant bank on December 10, 1932, vacated the premises at 208 South La Salle street, and thereafter, until the appointment of the receiver, occupied premises at 134 South La Salle street and paid rent therefor at the rate of $1,968.33 per month.

The note of defendant bank dated June 27, 1932, for $10,000,000 has been fully repaid. At the close of business November 19, 1934, there remained unpaid on the $30,000,000 note the principal amount of $7,103,710.25, plus certain accrued interest. On the same date there remained unpaid on the $50,000,000 note the principal amount of $49,456,036.61, plus certain accrued interest. At the close of business January 15, 1936, there remained unpaid on the $30,000,000 note the principal amount of $7,099,554.61, plus accrued interest in the amount of $1,357,250.51, and on the $50,000,000 note the principal amount of $47,291,841.78, plus accrued interest in the amount of $107,197.27. Until the appointment of the receiver on November 21, 1934, plaintiff credited only $543,963.39 on the $50,000,000 note. After the appointment of the receiver plaintiff credited all payments which it received upon the $50,000,000 note. All such payments received since the appointment of the receiver were derived exclusively from the proceeds of the pledged collateral, except about $3,800 which was remitted by the receiver to plaintiff.

Prior to November 21, 1934, all transactions with reference to the collateral pledged by the defendant bank as security for the loans of the plaintiff and the four participating banks, such as payments, renewals, extensions, substitutions, and withdrawals of prime collateral and subcollateral items, were entered into by plaintiff at the request, and upon the application, of the defendant bank, or, in the routine cases arising in the regular course of business, by the Federal Reserve Bank of Chicago as fiscal agent for the plaintiff. In all cases where such transactions did not originate in the defendant bank, that bank received prompt notice of the material details of the respective transactions. From November 21, 1934, until the present time, the plaintiff has liquidated the collateral and has given prompt notice of the material details of all transactions concerning said collateral to the receiver of the defendant bank. The defendant bank and later its receiver made a daily reconciliation of the figures on its books with the figures on the books of the Federal Reserve Bank of Chicago, as fiscal agent of the plaintiff, with respect to bills payable and interest charges.

On July 17, 1934, plaintiff made demand on defendant bank for the payment of the principal and interest due upon the $30,000,000 and $50,000,000 notes. Defendant bank responded that it was unable to comply with the demand.

On November 19, 1934, the defendant bank was unable to meet its debts as they matured. At that time the assets of the bank amounted to $76,228,145.68. All these assets were pledged to secure the debts of the defendant bank except cash and cash items in the amount of $82,960.92, funds held in suspense by the plaintiff in the amount of $538,934.04, and suspense debits in the amount of $8,466.82. Against these assets the defendant bank had bills payable in the amount of $58,335,451.47, accrued interest in the amount of $3,934,126.61, accrued taxes in the amount of $380,131.87, and other liabilities in the amount of $43,-646.29. The bills payable included more than $57,000,000 in principal due on the notes of the defendant bank to the plaintiff, which had become due on December 24, 1932. On November 21, 1934, the Auditor of Public Accounts of Illinois appointed William L. O'Connell as receiver of the defendant bank with authority to collect and conserve its assets. Prior to this time no steps had been taken with respect to the legal liquidation of the affairs of the defendant bank. On November 21, 1934, the Auditor of Public Accounts of Illinois filed a bill for the dissolution of the defendant bank.

According to the records of the defendant bank, all the defendant stockholders were the owners of stock of the defendant bank on one or more of the following dates: June 27, 1932, June 29, 1932, October 6, 1932, and July 11, 1933. Said defendants were such record owners of stock on the dates and in the amounts indicated by Plaintiff's Exhibits 135 and 135–A, which are hereby made a part hereof. Many of said defendants were also such record owners of such stock on one or more of the following dates: July 25, 1931, November 19, 1932, and March 31, 1933. Many of the defendants were such record owners of the same shares of stock of the defendant bank continuously from the opening of business July 25, 1931, until the close of business July 11, 1933. Many persons who are not defendants herein were such record owners of stock of the defendant bank on July 25, 1931, but on none of the other aforementioned dates. Many of the defendants were such record owners of stock from July 25, 1931, until after June 29, 1932, but ceased to be such record owners prior to October 6, 1932. Many of the defendants were not such record owners on or prior to June 29, 1932, but became such record owners prior to October 6, 1932, were such record owners on October 6, 1932, and continued to be such record owners until the close of business on July 11, 1933. Many persons who are not defendants herein were not such record owners of stock of the defendant bank on or prior to October 6, 1932, but became such record owners of such stock subsequently to October 6, 1932, and were such record owners of such stock on November 19, 1932, or on March 31, 1933, or on both of said dates.

Pursuant to the provisions of section 5 of the Reconstruction Finance Corporation Act (47 Stat. 6), the plaintiff has made numerous loans to the various types of financial institutions enumerated in said section 5, the stockholders of which are not liable in any degree whatsoever for the liabilities of such financial institutions respectively. The plaintiff has also made numerous loans to banks organized under the laws of, and located in, all the states of the United States and to national banking associations.

On and prior to July 25, 1931, the Chicago Trust Company was a banking association duly organized and existing under and by virtue of the General Banking Act of 1919, as amended (Smith-Hurd Ill.Stats. c. 16½, § 1 et seq.), of Illinois; and had its usual and principal place of business in Chicago, Ill. On and prior to July 25, 1931, the Central Trust Company of Illinois was a banking association duly organized and existing under and by virtue of the General Banking Act of 1919, as amended, of Illinois; and had its usual and principal place of business in Chicago, Ill. On and prior to July 25, 1931, the National Bank of the Republic of Chicago was a national banking association duly organized and existing under and by virtue of the National Bank Act (12 U.S.C.A. § 21 et seq.) and had its usual and principal place of business in Chicago, Ill.

On July 25, 1931, the National Bank of the Republic of Chicago, as "grantor," and the Chicago Trust Company, as "grantee," entered into an agreement providing, among other things, as follows:

"1. Except as hereinafter set forth, the Grantor has sold, conveyed, transferred, set over and delivered, and by these presents does sell, convey, transfer, set over and deliver, to the Grantee all the assets, business, effects and property of the Grantor, real, personal and mixed, tangible and intangible, of every kind, nature and de-

scription and wheresoever situate, including particularly, but not exclusively, any and all property of every kind, nature and description held in trust by or in possession of any other person, persons or corporation whatsoever for the benefit of the Grantor or in which the Grantor has any right, claim or interest of any kind, directly or indirectly, all as of the close of business on July 24, 1931, to be the absolute property forever of the Grantee, upon the terms and conditions herein contained. * * *

"3. Nothing herein contained shall be construed as transferring to the Grantee any property or assets held by the Grantor in any trust capacity created by any written instrument or by the appointment of any court or other appointing body, nor shall anything in this instrument contained be construed as an assumption by the Grantee of any liabilities of any kind or character of the Grantor as trustee in any such trust. * * *

"8. It is the intention of these presents that (except as otherwise provided in paragraph 3 and paragraph 7 hereof) the Grantor shall, and it does hereby, convey and transfer to the Grantee each and every species and item of property, right, privilege or thing of value belonging to the Grantor which it is in law capable of so transferring and conveying, and that in respect of any property belonging to Grantor which Grantor is presently incapable of transferring Grantor will convert or realize upon the same as rapidly as possible and pay over to Grantee from time to time the net proceeds of such conversion or realization."

On July 25, 1931, the National Bank of the Republic of Chicago made the transfer provided for by the aforesaid agreement of July 25, 1931, and as part of the consideration for the assets so transferred, the Chicago Trust Company duly issued 1,000 new shares of its capital stock to certain trustees for the benefit of the stockholders of the National Bank of the Republic of Chicago.

Thereafter, and on July 25, 1931, the respective boards of directors and the stockholders of the Chicago Trust Company and the Central Trust Company of Illinois duly adopted resolutions providing that the Chicago Trust Company and Central Trust Company of Illinois consolidate to form the Central Republic Bank & Trust Company, the defendant bank herein referred to, in accordance with the banking laws of Illinois.

These resolutions all contained the following paragraph: "(k) The Consolidated Corporation (meaning the Central Republic Bank and Trust Company), shall possess and be vested with all of the rights, privileges, powers, franchises, licenses, estate, effects, things in action, moneys, debts due upon whatever account, trusts, and property, real, personal and mixed, of every kind and character of said Chicago Trust Company and said Central Trust Company of Illinois, and shall be subject to all of their respective debts, liabilities and duties."

On the same day, July 25, 1931, all steps required by the banking laws of Illinois to effect the consolidation of the Chicago Trust Company and the Central Trust Company of Illinois to form the defendant bank were duly taken by duly authorized persons, and on said day, pursuant to the banking laws of Illinois, the Auditor of Public Accounts of Illinois duly approved said consolidation and issued a certificate authorizing said defendant bank to commence business as a bank or banking association under the banking laws of Illinois. Thereafter, all conditions subsequent required to be performed by the banking laws of Illinois in order to perfect said consolidation were duly performed.

After the execution of the agreement between the National Bank of the Republic of Chicago and the Chicago Trust Company referred to herein and at the time of the said consolidation, the Chicago Trust Company had assets equal to its known liabilities and $12,000,000 additional assets. At the time of the said consolidation the Central Trust Company of Illinois had assets equal to its known liabilities and $16,000,000 additional assets. After the consolidation of the Chicago Trust Company and the Central Trust Company of Illinois, the defendant bank had assets equal to its known liabilities, being the liabilities of the Chicago Trust Company and the Central Trust Company of Illinois, and $28,000,000 additional assets. These additional assets account for the capital of $14,000,000, the surplus of $10,000,000, and the reserve for operating expenses of $4,000,000, which the defendant bank set up at the time of its organization.

As a part of the general plan for the reorganization of the Central Trust Company of Illinois, the National Bank of the

Republic of Chicago and the Chicago Trust Company, the National Republic Company, an investment affiliate of the two latter banks, agreed to indemnify the defendant bank against all undisclosed liabilities of the National Bank of the Republic of Chicago and of the Chicago Trust Company which might be asserted against the defendant bank. The term "liabilities" as used in the indemnification agreement was defined to include "liabilities for taxes of whatsoever kind."

Defendant bank was organized in July, 1931, as a consolidation of Chicago Trust Company, Central Trust Company, and National Bank of the Republic, and became liable to the United States for taxes assessed against it as transferee of said banks in the aggregate amount of $45,478.18. All of said tax claims accrued against defendant bank on July 25, 1931, and are now due and unpaid.

Claimants, other than plaintiff, have filed claims against defendant bank in dissolution proceedings in the state court, and with the receiver of the bank. Claims aggregating $288,451.27 have been filed with the receiver in this court. The files of the receiver show unpaid claims against defendant bank based on invoices aggregating $8,959.43 in amount. There are unsatisfied judgments and decrees against defendant bank for more than $25,000. The books of the bank show items of interest rebates due to more than one hundred persons, in the aggregate amount of between $4,000 and $5,000.

WILKERSON, District Judge (after finding the facts as above).

After the motions to dismiss were overruled [(D.C.) 11 F.Supp. 976], the defending stockholders filed answers and the suit has been heard on the merits.

The principal defenses relied on are:

1. The Reconstruction Finance Corporation Act is unconstitutional.

2. Plaintiff, in view of the federal law creating it, has no right, under the facts of this case, to enforce the stockholders' liability arising from the Constitution of Illinois.

3. The $50,000,000 transaction of October 6, 1932 was ultra vires the plaintiff.

4. The $50,000,000 transaction of October 6, 1932, was illegal and in violation of section 207 of the Reconstruction Finance Corporation Act (15 U.S.C.A. § 605d).

5. The $50,000,000 transaction of October 6, 1932, was ultra vires the defendant bank, and created no statutory liability against its stockholders.

6. Defendant bank, on October 6, 1932, was not a banking corporation or institution within the meaning of the provision of the Illinois Constitution as to stockholders' liability.

7. Plaintiff has failed to prove the averments of its bill as to the existence of other creditors to whom the defendant stockholders are liable.

8. Plaintiff, having participated in the liquidation of defendant bank in a manner contrary to the Illinois Banking Act (Smith-Hurd Ill.Stats. c. 16½, § 1 et seq.), cannot obtain relief based upon such acts.

9. The transaction by which the deposit liabilities of defendant bank were transferred to the City National Bank was a fraud on the stockholders of the defendant bank. Plaintiff's participation in that fraud is a bar to its obtaining any relief in this suit.

The court has made findings of fact, and they are filed herewith. The facts will be further considered in connection with the legal points advanced by the defendants.

### Validity of Reconstruction Finance Corporation Act.

Some of the defendants assert that the Reconstruction Finance Corporation Act is unconstitutional. They urge that there is no constitutional provision authorizing it, and that it offends the Ninth and Tenth Amendments.

The power of Congress to create a corporation as an agency through which governmental purposes are to be fulfilled and to endow it with all of the powers of a private corporation, including the power to make and enforce contracts as if they had been made by a private corporation, is no longer open to question. United States Shipping Board Merchant Fleet Corp. v. Harwood, 281 U.S. 519, 525, 50 S.Ct. 372, 373, 74 L.Ed. 1011; United States ex rel. Skinner & Eddy Corp. v. McCarl, 275 U.S. 1, 8, 48 S.Ct. 12, 14, 72 L.Ed. 131.

The Reconstruction Finance Corporation was created to give temporary aid to distressed agricultural and commercial institutions and railroads in an effort to stabilize financial conditions, to strengthen the national credit and currency system and

to assist fiscal institutions, including those created by Congress. In Baltimore National Bank v. State Tax Commission, 297 U.S. 209, 211, 56 S.Ct. 417, 419, 80 L.Ed. 586, the court said: "The purpose to be served is the rehabilitation of finance and industry and commerce, threatened with prostration as the result of the great depression." That purpose falls within the scope of the powers granted to the Congress by the Constitution. Norman v. Baltimore & Ohio Railroad Company, 294 U.S. 240, 303, 55 S.Ct. 407, '414, 79 L.Ed. 885, 95 A.L.R. 1352; Federal Land Bank v. Priddy, 295 U.S. 229, 231, 55 S.Ct. 705, 706, 79 L.Ed. 1408; Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577; Farmers' National Bank v. Dearing, 91 U.S. 29, 23 L.Ed. 196; McCulloch v. State of Maryland, 4 Wheat. 315, 316, 4 L.Ed. 579; Osborn v. United States Bank, 9 Wheat. 738, 6 L.Ed. 204.

United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, does not aid the defendants in their attack upon the statute. That case held that contracts for the reduction of acreage and control of production are outside the range of federal power. There is not in it any intimation of a lack of power on the part of Congress to appropriate money in the promotion of the general welfare for agricultural conservation or relief. The power of Congress to tax and appropriate for matters of national welfare is reasserted. What Congress may do directly in the extension of such aid, it may do through the instrumentality of a corporation created for that purpose, and may clothe that corporation with all the attributes and powers of a private corporation.

The assertion in the name of the rights of the states, that the creation of the Re-construction Finance Corporation violates the Ninth and Tenth Amendments, places restrictions on the power of the national government which are not sustained by either reason or authority.

The defense of unconstitutionality of the statute is overruled.

### Rights of Plaintiff under Statute Creating it to Enforce Stockholders' Liability Imposed by State Law.

The defendants deny the power of the Reconstruction Finance Corporation to proceed against stockholders of corporations to which it has loaned money for the enforcement of a stockholder's liability imposed by state law in favor of the creditors of such corporations. They assert that this absence of power is demonstrated by the language of the statute and its history, and is in accordance with the rule that Congress, having legislated on the subject, state laws may not be invoked to enlarge the act of Congress. They claim further that the successful exercise of the power against the defendants would violate their rights under the Fifth Amendment.

This defense, in some of its aspects, was considered in overruling the motions to dismiss (11 F.Supp. 976). The points upon which defendants rely were reargued at the trial. The court is satisfied that nothing has been added in proof or argument to warrant a modification of the conclusions reached on the motions to dismiss.

It is argued that certain portions of the Reconstruction Finance Corporation Act indicate the intent of Congress to withhold from the corporation rights which any other creditor would have with respect to loans. The language in sections 5 [1] and

---

1 Section 5 of the Reconstruction Finance Corporation Act (47 Stat. 6, 7) provides:

"To aid in financing agriculture, commerce, and industry, including facilitating the exportation of agricultural and other products the corporation is authorized and empowered to make loans, upon such terms and conditions not inconsistent with this Act as it may determine, to any bank, savings bank, trust company, building and loan association, insurance company, mortgage loan company, credit union, Federal land bank, joint-stock land bank, Federal intermediate credit bank, agricultural credit corporation, livestock credit corporation, organized under the laws of any State or of the United States, including loans secured by the assets of any bank that is closed, or in process of liquidation to aid in the reorganization or liquidation of such banks, upon application of the receiver or liquidating agent of such bank and any receiver of any national bank is hereby authorized to contract for such loans and to pledge any assets of the bank for securing the same: Provided, That not more than $200,000,000 shall be used for the relief of banks that are closed or in the process of liquidation.

"All loans made under the foregoing provisions shall be fully and adequately secured. The corporation, under such

8[2] of the act are cited in support of that construction of the statute.

It is said that as the plaintiff may not make loans which are not fully secured and as a stockholder's liability is not security, Congress must have intended that the plaintiff should look solely to the pledged collateral for repayment of loans. This view is fortified, it is said, by the provisions as to loans to receivers and liquidating agents secured by assets in their possession, as to the disposition of collateral, and as to the examination of the business of applicants for loans.

The argument, in my opinion, rests upon a misconception of the nature and effect of the provisions of the law which control the acts of the board of directors. The statute vests the management of the corporation in seven directors and contains many provisions regulating their acts. Each director is required to take an oath faithfully to discharge the duties of his office. It is not a reasonable construction of the statute to impute to Congress the intention, when it prescribed rules for the governance of the directors, of limiting the rights of plaintiff under contracts made in the exercise of its corporate power. In order that the purpose for which the corporation was created might be better fulfilled, Congress chose an instrument having the power to contract, as well as all the other powers of a private corporation, but with its actions government controlled and all of its assets supplied from government sources. To say that Congress intended, when it required that the directors should take adequate security for loans made by the corporation, to take away from the corporation rights conferred upon it by the grant of power to make contracts, is to substitute remote conjecture for the express words which could have been used if there were any such intent on the part of Congress. When the notes of defendant bank were given and accepted and the mon-

---

conditions as it shall prescribe, may take over or provide for the administration and liquidation of any collateral accepted by it as security for such loans. Such loans may be made directly upon promissory notes or by way of discount or rediscount of obligations tendered for the purpose, or otherwise in such form and in such amount and at such interest or discount rates as the corporation may approve: Provided, That no loans or advances shall be made upon foreign securities or foreign acceptances as collateral or for the purpose of assisting in the carrying or liquidation of such foreign securities and foreign acceptances. In no case shall the aggregate amount of advances made under this section to any one corporation and its subsidiary or affiliated organizations exceed at any one time 5 per centum of (1) the authorized capital stock of the Reconstruction Finance Corporation plus (2) the aggregate amount of bonds of the corporation authorized to be outstanding when the capital stock is fully subscribed. * * *

"Except as provided in section 5a hereof, no loan or advancement shall be made by the corporation for the purpose of initiating, setting on foot, or financing any enterprise not initiated, set on foot, or undertaken prior to the adoption of this Act: Provided, That the foregoing limitation shall not apply to loans made to agricultural or livestock credit corporations, or Federal land banks, joint-stock land banks, or Federal intermediate credit banks, nor to loans made to banks for the purpose of financing agricultural operations."

[2] Section 8 of the Reconstruction Finance Corporation Act (47 Stat. 8) is as follows:

"In order to enable the corporation to carry out the provisions of this Act, the Treasury Department, the Federal Farm Loan Board, the Comptroller of the Currency, the Federal Reserve Board, the Federal reserve banks, and the Interstate Commerce Commission are hereby authorized, under such conditions as they may prescribe, to make available to the corporation, in confidence, such reports, records, or other information as they may have available relating to the condition of financial institutions and railroads or railways with respect to which the corporation has had or contemplates having transactions under this Act, or relating to individuals, associations, partnerships, or corporations whose obligations are offered to or held by the corporation as security for loans to financial institutions or railroads or railways under this Act, and to make through their examiners or other employees for the confidential use of the corporation, examinations of such financial institutions or railroads and railways. Every applicant for a loan under this Act shall, as a condition precedent thereto, consent to such examinations as the corporation may require for the purposes of this Act and that reports of examinations by constituted authorities may be furnished by such authorities to the corporation upon request therefor."

ey was turned over to the bank, the liability of the stockholders was as much a part of the usual contract in that situation as the liability of the bank and the right to resort to the collateral; and it would take stronger evidence that the isolated phrases of the statute which have been pieced together to sustain a finding that Congress intended to strike out a part of the contract.

Defendants, in my opinion, are not aided by the history of the legislation. We do not have to search through letters and debates to discover the purpose of the legislation. The act itself states its purpose: "To aid in financing agriculture, commerce, and industry, including facilitating the exportation of agricultural and other products." The method chosen for extending the aid in the emergency then confronting the nation was through loans made either upon promissory notes, or by way of discount or rediscount of obligations tendered for that purpose or otherwise in such form and in such manner and at such interest or discount rates as the corporation may approve. There is no intimation of an intent to use the words "loans," "notes," and "obligations" in any other than their usually accepted meaning.

Defendants call attention to the omission from the act of the following provision of the bill as it passed the Senate: "The corporation shall have such incidental powers as the board of directors shall deem necessary and expedient in carrying out the provisions of the act." The language just quoted was not in the bill as it was introduced in the House, and as it passed the House. In conference the House bill, with some changes, was adopted. The failure of the conference committee to insert the quoted provision in the House bill is not anything upon which even a remote conjecture can be based as to the intention of Congress with reference to the enforcement of stockholders' liability. The power to enforce a stockholders' liability is not an "incidental power." The stockholders' liability is an essential part of the contract which the corporation is directly empowered to make. By virtue of the Illinois law, the obligation of the stockholders is as much a part of the contract as the obligation of the bank itself. Proceedings to enforce the liability of stockholders are no more the exercise of an incidental power than are the proceedings against the bank

on the note or proceedings to sell the collateral pledged as security.

Defendants attach significance to that part of section 5 which provides: "All loans made under the foregoing provisions shall be fully and adequately secured." It is said that the corresponding provision in the bill as it was introduced in and passed the Senate was as follows: "All loans shall be fully and adequately secured in such manner as the corporation shall require." The language of the act in this respect is the language of the House bill. There were no changes of phraseology in the conference committee from which an inference as to intent of Congress can be drawn. The alleged difference in meaning between the House and Senate bill is too fine to furnish ground for an inference of intent to take away from the finance corporation a part of its rights under contracts which it was authorized to make. The direction as to the adequacy of the security is the same in both, and in view of the language used a few lines further down in the section (see footnote 1, supra) the words "in such manner as the corporation shall require" might very well have been rejected as superfluous.

It is claimed that the plaintiff, in the dealings relative to the loan, considered the statute as not conferring the right to enforce the stockholders' liability, and, therefore, waived its right, if it had such a right, to proceed against the stockholder defendants. This view of the evidence cannot be accepted. To be sure there is nothing in the application for the loan and the resolution of the finance corporation approving it, about the stockholders' liability, and there appears to have been no reason why anything should have been put in those documents about it. If plaintiff was a creditor within the meaning of the Illinois Constitution, the stockholders' liability was by law as much a part of the contract as if it had been written in terms in the application and resolution. An inference of waiver of the stockholders' liability cannot be drawn against the plaintiff because there are provisions with reference to the pledged collateral in the application and resolution and nothing about the stockholders' liability.

The evidence is clear, however, that the liability of the stockholders was considered when the loan was authorized. The chairman of the board and the president of de-

fendant bank gave estimates and opinions as to the amount which could be realized through the assertion of such liability. In the discussions between plaintiff's board of directors and representatives of defendant bank as to the steps to be taken in connection with the disbursement of the last $50,-000,000 of the authorized loan, assurances were given by the bank's agents that what they proposed to do would not affect the liability of the stockholders. It may be that back of those assurances was the concealed thought that there was no liability, and, therefore, nothing to be affected, but certainly such a hidden reservation cannot aid the defendants in their claim that plaintiff has waived its right to proceed against the stockholders. A careful review of this record compels the conclusion that, assuming that the parties were acting frankly and openly, both the plaintiff and the responsible officers and agents of the bank, throughout the transactions with reference to this loan, acted in the belief that both the bank and the stockholders were liable for the loan.

Defendants at the trial renewed the argument as to the intent of Congress, based on United States v. Stanford, 161 U. S. 412, 16 S.Ct. 576, 40 L.Ed. 751. A reexamination of the language of that case in the light of its facts convinces me that it does not apply to the stockholders' liability here involved. The Stanford Case dealt with an act of Congress which itself was the contract between the railroad companies and the United States. The statute provided that the corporation organized under California law should have all the rights and privileges and be subject to the same terms and conditions as the one organized under Federal law. The court found in the statute itself evidence of intended uniformity of treatment of the two corporations. The Reconstruction Finance Corporation Act did not provide for any specific loans. Plaintiff corporation was created and expressly authorized to make contracts for loans and to sue and to be sued with reference thereto. It was empowered to make loans upon such terms and conditions, not inconsistent with the act, as it might determine. No one is entitled to a loan from the Reconstruction Finance Corporation as a matter of right. The board of directors decides whether or not a loan is to be made. The mandate as to adequacy of security speaks, of course, as of the time when the loan is made. In

determining whether a loan is to be made at all or not, and in looking forward to the protection of the finance corporation, the board of directors may properly take into consideration the liability of stockholders, if any, for the loan. The contract here is not between the bank and the United States. It is between the bank and a corporation created by Congress, having the power to contract and other powers of a private corporation. The stockholders' liability is a part of the contract, the consent of the stockholder having been given when he acquired the stock. It is a misuse of words to say that Congress practiced discrimination when it gave to the Reconstruction Finance Corporation power to make contracts with corporations whose stockholders were subject to liability as well as with corporations whose stockholders were not liable to creditors. The Stanford Case, in my opinion, does not aid the defendants.

Some of the defendants rely upon United States v. Guaranty Trust Company, 280 U.S. 478, 50 S.Ct. 212, 74 L.Ed. 556. That case, it is said, supports the claim that Congress did not intend to confer upon the Reconstruction Finance Corporation power to enforce stockholders' liabilities under state laws. The case, in my opinion, does not touch the questions arising under the Reconstruction Finance Corporation Act. The United States there sought priority in receivership proceedings for claims arising under section 207, 209, and 210 of the Transportation Act of 1920 (41 Stat. 462, 464, 468). Section 3466, R.S.(31 U.S.C. A., § 191) gives the United States priority for all debts due it from insolvent debtors. The Transportation Act itself prescribed the terms of loans to be made to the railroads and left it to the President or Secretary of the Treasury, as the case might be, to determine the security to be required. The case did not involve the terms of the contract as between the United States and the railroad. It involved the rights of the United States in relation to the rights of other creditors. The court held that, in view of the purpose of the legislation, and the specific provisions of the statute, Congress could not have intended that section 3466, R.S.(31 U.S.C.A. § 191) should apply. The rules of construction there stated do not apply, in my opinion, to the portions to the Reconstruction Finance Corporation Act under consideration. Here Congress has created a corporation, endowed

294

it with the powers of a private corporation and given it power to make contracts with reference to loans by it. The question here is not whether Congress intended to give the United States an advantage over other creditors. Rather the question is: Did Congress intend that the contracts of the Reconstruction Finance Corporation should be the same in their effect as the contracts which the corporations to which it loaned money made with their other creditors? That stockholders under some contracts might be liable and under others, not, does not amount to discrimination by Congress in favor of one class against another. The difference arises not from the act of Congress, but from the very terms of the contracts themselves which the corporation created by Congress is authorized to make. The difference was created by the act of the stockholder when he purchased his stock and by the act of his corporation in applying for the loan. Did Congress intend that if the finance corporation loaned money to a bank with which to pay its depositors, the corporation would be in a worse position than the depositor would have been if he had been obliged to sue to recover the amount of his deposit? Did Congress intend that the corporation should not have equal treatment with other creditors? The conclusion is inescapable that when Congress created this corporation and gave to it the power to contract with reference to loans, it intended to place it on an equality with other creditors—no better and no worse—and to give to its contracts the same force and effect as those of any other creditor.

▬▬ Defendants invoke the rule that as plaintiff was created by federal law, that law fixed its rights and obligations and may not be enlarged or diminished in any way by a state law.[3]

The rule, however, does not have the broad application which defendants attempt to give to it. In determining whether or not Congress has occupied a given field in such a way as to exclude the operation of state laws, the entire scheme of the federal statute must be considered. The intent to supersede the operation of the state statutes in such a case is not to be implied unless the repugnance is direct and positive, so that the two acts cannot be reconciled or consistently stand together. Missouri, Kansas & T. Ry. Co. v. Harris, 234 U.S. 412, 34 S.Ct. 790, 58 L.Ed. 1377, L.R.A.1915E, 942; Savage v. Jones, 225 U. S. 501, 533, 32 S.Ct. 715, 56 L.Ed. 1182; Reid v. Colorado, 187 U.S. 137, 148, 23 S. Ct. 92, 47 L.Ed. 108; Sinnot v. Davenport, 22 How. 227, 243, 16 L.Ed. 243.

The application to the Reconstruction Finance Corporation Act of the sweeping rule asserted by defendants would lead to absurd results. The statute empowers the finance corporation to make loans to "any bank, savings bank, trust company, building and loan association, insurance company, mortgage loan company, credit union, Federal land bank, joint-stock land bank, Federal intermediate credit bank, agricultural credit corporation, live stock credit corporation, organized under the laws of any State or of the United States," and authorizes it to make contracts with reference to such loans. The finance corporation has been given the powers of a private corporation. Do the laws of the states under which the corporations with which the finance corporation transacts business are organized have no application to the contracts which the finance corporation makes? The entire scheme of this statute shows that Congress did not intend to impose any such limitation as that claimed by defendants upon the contracts of the corporation which it had created, and that state statutes are to apply to its contracts unless there is a direct and positive repugnance between them and the act of Congress. It would be an unwarranted application of the rule to take away from the Reconstruction Finance Corporation a benefit under its contract conferred by state law in the absence of a clear expression by Congress of its intent that the state law should not apply. The defendants themselves have insisted earnestly that the $50,-000,000 note is void because at the time it was given the defendant bank was not a

3 Missouri Pacific R. Co. v. Porter, 273 U.S. 341, 47 S.Ct. 383, 71 L.Ed. 672; First National Bank v. California, 262 U.S. 366, 43 S.Ct. 602, 67 L.Ed. 1030; New York Central R. C. Co. v. Winfield, 244 U.S. 147, 37 S.Ct. 546, 61 L.Ed. 1045, L.R.A.1918C, 439, Ann.Cas.1917D, 1139; Michigan Central R. Co. v. Vreeland, 227 U.S. 59, 33 S. Ct. 192, 57 L.Ed. 417, Ann.Cas.1914C, 176; Easton v. Iowa, 188 U.S. 220, 23 S.Ct. 288, 47 L.Ed. 452; Farmers', etc., Bank v. Dearing, 91 U.S. 29, 23 L.Ed. 196; Duncan's Heirs v. United States, 7 Pet. 435, 8 L.Ed. 739.

banking corporation or institution within the meaning of the Illinois Constitution.

Defendants urge that if plaintiff's construction of the statute is adopted, the act violates the Fifth Amendment. It is not correct to say, however, that there is a lack of uniformity in the operation of this act of Congress. The finance corporation has the same power to contract with corporations organized under the laws of one state as with corporations organized under the laws of any other state. Its contracts, like those of a private corporation, are subject to state law, except as Congress has expressly provided otherwise in the statute, or has indicated a clear intention that the state law is not to control. The alleged discrimination relates to something which is part of the law under which the defendant bank was organized, and it is written in the plaintiff's contract with that bank by that law. Congress did not violate the Fifth Amendment when it created a corporation and gave to it power to make contracts for loans, the legal effect of which is dependent upon the law of the state in which the corporation with which the contract is made was organized.

### The Defense that Plaintiff had no Power under Section 5 of the Reconstruction Finance Corporation Act (47 Stat. 6) to Make the Loan.

Defendants claim that the plaintiff did not have power under section 5 of the act to accept the note of October 6, 1932, for $50,000,000 and turn over the amount thereof to the defendant bank. This position is sustained, they say, by the absence from the statute of any express provision which authorizes plaintiff to make a loan to a bank which plaintiff knows intends to transfer its deposit liabilities to another bank and to turn over the amount of the loan to the bank assuming the liability to depositors. They stress in support of this construction the clause which relates to loans to receivers and liquidating agents of banks that are closed or in process of liquidation. They argue that the statute clearly defines two classes of loans which plaintiff is empowered to make; that loans to a "bank" must be made to a going institution; that loans to a bank in process of liquidation may be made only to a receiver or liquidating agent; that when defendant bank decided to transfer its deposit liabilities to another bank it was "in process of liquidation";

and, therefore, plaintiff had no power to lend money to it.

The language of the statute is not reasonably susceptible of the construction which defendants attempt to give it. They try to read into the statute, by speculation and conjecture, limitations upon plaintiff's power which Congress did not insert. Congress in plain words empowered plaintiff "to make loans, upon such terms and conditions not inconsistent with this act as it may determine, to any bank * * * organized under the laws of any state or of the United States, including loans secured by the assets of any bank that is closed, or in process of liquidation to aid in the reorganization or liquidation of such banks, upon application of the receiver or liquidating agent of such bank and any receiver of any national bank is hereby authorized to contract for such loans and to pledge any assets of the bank for securing the same." The grant of power to make loans to state and national banks is all-embracing. The provision for loans to receivers and liquidating agents is not, in any respect, a limitation of that power. It is an extension of the power so as to take in loans to receivers and liquidating agents of banks when such have been appointed. If we look at the purpose of the statute, there is as much reason for making a loan to a bank which is protecting its depositors by a contract with another bank as there is for lending money to a receiver to assist him in liquidating the bank and paying the depositors in that way. We must not lose sight of the fact that the primary object of banking laws, as well as of the Reconstruction Finance Corporation Act, so far as it concerns banks, is the protection of depositors and not stockholders.

We are not now considering the terms and conditions of the loan which was approved by the plaintiff. We are considering merely the power of plaintiff, under the act creating it, to make a loan to a bank which is about to cease accepting deposits, and which is about to make a contract with another bank for the payment of all of its depositors. There is nothing in either the language of the statute, or in the history of this legislation, which supports the view that Congress intended to place upon plaintiff's power the limitations urged by the defendants.

It is said, however, that plaintiff's acts show that when it approved the loan it construed the statute as defendants now say it

should be construed. Plaintiff asked and received from General Dawes, chairman of the board of defendant bank, the assurance that the loan was for current requirements, including the payment of deposits, in order to keep the bank open and not in contemplation of liquidation. It is quite evident that this assurance was asked in view of the statement of General Dawes that the bank would be closed unless money sufficient to pay the depositors in full could be borrowed. It is equally clear that the assurance was given in good faith, and that the officers of the bank believed that with the aid of the loan its deposits would be restored to a point where the bank could continue to operate. The loss of deposits continued. The burden of expense was too heavy. The only course for the protection of both depositors and stockholders was an arrangement of the kind which was ultimately made. Plaintiff's board of directors did not include in the approval of the loan on June 27, 1932, a provision that the bank was to remain open for any definite time. To say that plaintiff's board of directors construed the statute to forbid loans to a bank which was to use the money for protecting its depositors through a contract with another bank, is equivalent to charging the board of directors of the Reconstruction Finance Corporation with breach of official duty, and with conspiring with the officers of defendant bank to defraud the corporation. This the record in this case does not sustain.

### The Defense Based upon the Claim that the $50,000,000 Transaction of October 6, 1932, was Illegal.

■ Defendants invoke section 207 of the act (15 U.S.C.A. § 605d), which is as follows: "No loan or advance shall be approved under this chapter, directly or indirectly, to any financial institution any officer or director of which is a member of the board of directors of the Reconstruction Finance Corporation or has been such a member within the twelve months preceding the approval of the loan or advance." This section was added by the amendment of July 21, 1932, 47 Stat. p. 715 (15 U.S.C. § 605d [15 U.S.C.A. § 605d]), subsequent to the adoption by plaintiff's board of the resolution of June 27, 1932, approving a loan of $90,000,000 to defendant bank. It is claimed by defendants that the $50,000,000 transaction of October 6, 1932, was not covered by the approval of June 27, 1932, but by an approval given aft-

er the enactment of section 207. This violation of section 207, it is further claimed, made the $50,000,000 transaction illegal, so that no action can be maintained on the $50,000,000 note against either the defendant bank or its stockholders.

Was there a violation of section 207? The charge is a serious one. Regardless of the question of the punishment of violators or the effect of the violation upon the rights of the parties under their agreement, the charge involves breach of official duty on the part of plaintiff's directors and connivance in such breach on the part of the officers and directors of defendant bank.

It is clear that if the approval of June 27, 1932, covered the transaction of October 6, 1932, and there was no other approval after July 21, 1932, section 207 was not violated. Manifestly, Congress, when it used the word "approved," intended that the amendment of July 21, 1932, should not prevent the carrying out of commitments which had been made by plaintiff's board prior to that time. It was generally known that plaintiff had made a loan to defendant bank. The precise facts with reference to it could easily have been ascertained. When the amendment was passed most of the collateral pledged for the loan had passed under plaintiff's control. If Congress had intended to stop further payments to the bank under the approval already given because General Dawes had been a member of plaintiff's board, it would have manifested that intent by words more definite than those which were employed.

In support of the claim that the approval of the $50,000,000 transaction was given after July 21, 1932, in direct violation of section 207, defendants argue (1) that section 5 (47 Stat. 6, 7) prior to the amendment of July 21, 1932, forbade a loan for the purpose for which the $50,000,000 was used; (2) that the approval of the loan of $90,000,000 on June 27, 1932, was given on condition that the money be used to keep the bank open and not for the purposes of liquidation; (3) that the application for the loan, upon which the approval was based, bound the bank to use the money for paying existing bills payable and to increase cash reserves; (4) that plaintiff imposed new terms and conditions subsequent to July 21, 1932, the performance of which was made a condition to the turning over of the balance of $50,000,000 to the bank.

Prior to July 21, 1932, section 5 of the Reconstruction Finance Corporation Act (47 Stat. 7) contained the following: "Except as provided in section 5a hereof, no loan or advancement shall be made by the corporation for the purpose of initiating, setting on foot, or financing any enterprise not initiated, set on foot, or undertaken prior to the adoption of this Act." That provision was repealed on July 21, 1932 (47 Stat. 714, § 203). The $50,000,000 which was turned over to defendant bank on October 6, 1932, was not used to initiate, set on foot or finance a new enterprise. It was turned over to defendant bank and, with plaintiff's knowledge, used to take care of the depositors of defendant bank through a contract between that bank and the City National Bank. None of the money was used to provide capital for the new bank. This defense is based, in my opinion, upon an erroneous construction of the repealed provision of section 5. That section prior to the amendment of July 21, 1932, did not prohibit the making of a loan to be used as the last $50,000,000 of this loan was used in connection with a contract with another bank for the protection of the depositors of the bank to which the loan was made. The assurance of General Dawes that he intended to keep the bank open did not require a new approval of the loan before the balance of $50,000,000 was turned over on October 6, 1932. The approval was made after General Dawes had made his statement as to his intention with respect to closing the bank; but the approval, as shown by the records of the board of directors, was subject to no conditions except those stated in the application and the resolution approving the loan. There can be no doubt upon this record as to the good faith of the representation by General Dawes. The bank was later obliged by heavy expenses and interest charges to change its plans for the protection of its depositors. The assurance of General Dawes did not create a restriction upon the manner in which the money was to be used to take care of the bank's obligations to its depositors. The original approval, particularly in view of the turning over of the pledged collateral to plaintiff's control, was sufficient to cover the payment of October 6, 1932.

Defendants urge that by the terms of the agreement for the loan, the money could not be used in the way in which the bank used the last $50,000,000, and that, therefore, another approval of the transaction by the board was required before the money could be turned over. It has been stated above that, in my opinion, the representations made by General Dawes as to the intention of the bank to keep open was not a restriction upon the use of the money by the bank. It might have furnished a ground for the rescission of the action of the board approving the loan if the representation had been fraudulent and in bad faith. Certainly if plaintiff did not complain, the bank and its stockholders are not in a position to complain after they have taken the money and used it to discharge their liability to their depositors.

Defendants also call attention to that part of the application for the loan where it is stated that the loan was desired for the purpose of paying existing bills and increasing cash reserves. It would be a strained and unreasonable construction of this language to say that it is inconsistent with the making of a contract with another bank by which the depositors of the defendant bank were to be paid. In my opinion, it does not have the meaning which defendants try to give to it. But if the money had been used for a purpose different from that stated in the application, the failure of plaintiff to object would not amount to the approval of a new loan. Defendants cannot escape liability by taking advantage of the manner in which the bank used the money for the loan of which approval was given on June 27, 1932, to satisfy the liability of itself and its stockholders to its depositors.

It is further urged by defendants that the new requirements imposed by plaintiff as a condition to the turning over of the last installment of $50,000,000 indicate that there was a new approval by the plaintiff of that part of the loan. It has been pointed out already that the resolution of June 27, 1932, was not inconsistent with the use of the money to be loaned, or a part thereof, in connection with the contract with another bank for the payment of depositors of defendant bank. An attempt was made in good faith to keep the bank open. Part of the loan had been used by the bank to pay off depositors who demanded their money. Most of the collateral had passed under plaintiff's control. The conditions recommended by the committee appointed by plaintiff's board of directors were within the scope of the orig-

inal approval and did not require any further action on the part of the board. That was the effect of the committee's report. The committee recommended that if the stated conditions were satisfied, the board would be justified in indicating that it "had no objection to the consummation of the plan." The board took no further action on the report. Some of the recommendations of the committee were carried out in part; others were not. An outright approval of the conditions by the board, however, would have amounted to nothing more than an indication of consent by the board to acts which were permissible under the terms of the resolution of June 27, 1932.

It is clear from this record that plaintiff did not approve a loan or advance to defendant bank after July 21, 1932. The loan of $90,000,000 had been approved on June 27, 1932. The defendant bank placed before plaintiff's board of directors the facts with reference to loss of deposits and its inability to continue in business without piling up losses on account of rent and interest charges. The plan for the organization of a new bank was explained to the board. The committee referred to above was appointed by the board to confer further with the representatives of defendant bank. That committee presented a report recommending that if certain things were done the board should not oppose the consummation of the plan. The board took no further action. Plainly the board was of the opinion that the bank was complying substantially with the provisions of the resolution of June 27, 1932, and that the remaining portion of the loan should be turned over in accordance with the resolution. Plaintiff's acts throughout the transaction concerning the loan show conclusively that it was acting under the approval given on June 27, 1932. The record does not sustain defendants in their attempt to transform a transaction which was perfectly lawful when it was approved on June 27, 1932, and which undoubtedly was believed by both plaintiff's board and the officers of defendant to have been lawful when it was completed in October, into one which defendants assert is so illegal that plaintiff's rights arising with respect to it have been completely destroyed. A violation of a statute must be shown by evidence more convincing than the speculation, conjecture, and remote inference which is here presented.

The court is of the opinion, furthermore, that if the loan had been approved after July 21, 1932, the contract would not be voided for that reason. In passing upon contracts made in contravention of the statute, the court should carefully consider in each case the object of the statute, the evil it was enacted to remedy, and the effect of holding contracts in violation of it void, for the purpose of ascertaining whether or not the lawmaking power intended to make such contracts void; and, if, from all these considerations, it is manifest that the Legislature had no such intention, the contracts should be sustained and enforced; otherwise they should be held void. The words of the Supreme Court of Massachusetts, in passing upon a statute which provided that no member of a committee or officer of an insurance company charged with investing its funds should borrow the same, or be surety for such loans to others, apply to all statutes like the one under consideration here. The court said:

"Many other cases might be cited in which it has been held that contracts made in violation of the provisions of statutes are not void, upon the ground that the statutes are intended merely to be directory to the officers or persons to whom they are addressed, and not to be conditions precedent to the validity of contracts made in reference to them. Each statute must be judged by itself as a whole, regard being had, not only to its language, but to the objects and purposes for which it was enacted. If the statute does not declare a contract made in violation of it to be void, and if it is not necessary to hold the contract void in order to accomplish the purpose of the statute, the inference is that it was intended to be directory, and not prohibitory of the contract. * * *

"In other words, the purpose is to protect the corporation and the policy-holders from the dishonesty or self-interest of the officers. It is intended as a shield to the corporation. To construe it as making the promises of the officers who borrow money in violation of its provisions void, would defeat the main purpose of its enactment, and would visit the consequences of the unlawful act of the officers, not upon themselves, but upon the corporation for whose protection the statute was made. It would require a plain expression of legislative intention to lead us to such a construction.

"The plaintiffs contend that, unless the contract is held void, the statute is rendered nugatory. But this is not so. If the investing committee loans to an officer, in violation of the duty imposed by the statute upon them, all who participate in the act would be liable for all losses occasioned thereby, and thus the main purpose of protecting the policy-holders would be subserved." Bowditch v. New England Mutual Life Ins. Co., 141 Mass. 292, 4 N.E. 798, 801, 55 Am.Rep. 474.

Congress did not declare that contracts made in violation of section 207 (15 U.S. C.A. § 605d) should be voided. If that had been the purpose of Congress, it would have been easy to make it manifest. A few words would have expressed and accomplished that purpose. When section 207 is examined in the light of the established rules of interpretation, the conclusion is inescapable that Congress did not intend that beneficiaries of its violation should be permitted to keep the money loaned by the Reconstruction Finance Corporation, and be relieved from the obligations of their contracts. Harris v. Runnels, 12 How. 79, 13 L.Ed. 901; Union Gold Mining Co. v. National Bank, 96 U.S. 640, 24 L.Ed. 648; National Bank v. Whitney, 103 U.S. 99, 26 L.Ed. 443; First National Bank v. Stewart, 107 U.S. 676, 2 S.Ct. 778, 27 L.Ed. 592; Thompson v. St. Nicholas National Bank, 146 U.S. 240, 13 S.Ct. 66, 36 L.Ed. 956; McBroom v. Scottish Investment Co., 153 U.S. 318, 14 S.Ct. 852, 38 L.Ed. 729; Kerfoot v. Farmers' & Merchants' Bank, 218 U.S. 281, 31 S.Ct. 14, 54 L.Ed. 1042; Dunlop v. Mercer (C.C.A.) 156 F. 545; Bowditch v. New England Mutual Life Ins. Co., supra; Nelson & Co. v. Leiter, 190 Ill. 414, 60 N.E. 851, 83 Am.St.Rep. 142.

The cases relied on by defendants,[4] in my opinion, are not applicable to section 207 of the Reconstruction Finance Corporation Act.

## The Defense that the $50,000,000 Transaction of October 6, 1932, was ultra vires of Defendant Bank.

This defense asserts that the defendant bank had no power under its charter to enter into the transaction of October 6, 1932, whereby it gave to plaintiff its note for $50,000,000 and received that amount from plaintiff and used it to take care of its depositors through the contract with the City National Bank. The transaction, say the defendants, was ultra vires in the true sense, and not merely beyond the power of the directors; and, therefore, it could not be validated by the stockholders, and no rights based upon it may be asserted by plaintiff against either the bank or the stockholders. The power to borrow money, they assert, must be distinguished from the power to make a contract with a new bank for the protection of depositors; and, they further assert, that the contract between the old and the new bank was itself beyond the power of the old bank under its charter, and, therefore, void.

The steps by which this conclusion is reached are:

1. The bank possessed under Illinois law but two express powers: (a) To accept deposits; (b) to make loans.

2. The power to borrow, being an implied power, can be exercised only when necessary to the exercise of its express powers.

3. The bank on October 5, 1932, ceased to exercise its express powers.

4. The bank on October 6, 1932, had no power to borrow $50,000,000, or any other sum.

5. The bank had no power to borrow money in contemplation of liquidation or after it had entered upon a voluntary liquidation.

This line of defense assumes that the $50,000,000 transaction is to be looked up-

4 Bank of United States v. Owens, 2 Pet. (27 U.S.) 527, 7 L.Ed. 508; United States v. Grossmayer, 9 Wall. 72, 19 L.Ed. 627; Coppell v. Hall, 7 Wall. 542, 19 L.Ed. 244; California Bank v. Kennedy, 167 U.S. 362, 17 S.Ct. 831, 42 L.Ed. 198; Waskey v. Hammer, 223 U.S. 85, 32 S.Ct. 187, 56 L.Ed. 359; Ewert v. Bluejacket, 259 U.S. 129, 42 S.Ct. 442, 66 L.Ed. 858; Texas & Pacific Ry. Co. v. Pottorff, 291 U.S. 245, 54 S.Ct. 416, 78 L.Ed. 777; City of Marion v. Sneeden, 291 U.S. 262, 54 S.Ct. 421, 78 L.Ed. 787; Awotin v. Atlas Exchange Bank, 295 U.S. 209, 55 S.Ct. 674, 79 L.Ed. 1393; Kimen v. Atlas Exchange Bank, 295 U.S. 215, 55 S.Ct. 677, 79 L.Ed. 1398; Penn v. Bornman, 102 Ill. 523; Workingmen's Banking Co. v. Rautenberg, 103 Ill. 460, 42 Am. Rep. 26; Pattison v. Illinois Bankers' Life Ass'n, 360 Ill. 616, 196 N.E. 882.

on as a separate loan, and is to be viewed entirely apart from the chain of events leading up to the making of the note, and the payment of the money on October 6, 1932. Even in that aspect, the bank, in the condition in which it found itself on October 5, 1932, had the power to make a contract with another bank to take care of its liabilities to its depositors. Wyman v. Wallace, 201 U.S. 230, 26 S.Ct. 495, 50 L. Ed. 738; Poppleton v. Wallace, 201 U.S. 245, 26 S.Ct. 298, 50 L.Ed. 743; Hightower v. American National Bank, 263 U.S. 351, 44 S.Ct. 123, 68 L.Ed. 334; George v. Wallace (C.C.A.) 135 F. 286; Hightower v. American National Bank (C.C.A.) 276 F. 371; American Nat. Bank of Macon v. Commercial Nat. Bank (C.C.A.) 254 F. 249; Id. (D.C.) 248 F. 187; Id. (D.C.) 246 F. 721; Emery & Co. v. Wilkinson (C. C.A.) 72 F.(2d) 10; Hays v. Wilkinson (C.C.A.) 72 F.(2d) 201; Wannamaker v. Edisto National Bank of Orangeburg (C. C.A.) 62 F.(2d) 696; Richter v. Laredo National Bank (C.C.A.) 62 F.(2d) 289; Derscheid v. Andrew (C.C.A.) 34 F.(2d) 884; Chase v. Hall (C.C.A.) 30 F.(2d) 195; Harris v. Briggs (C.C.A.) 264 F. 726. And, unless the rule concerning implied power is narrowed to a point where it is nothing more than a verbal formality, the power to make that contract carries with it the power to negotiate a loan for the purpose of raising money to be used under the contract to protect depositors, if, in the judgment of the bank's directors, that course will best safeguard the interests of its depositors and stockholders.

In passing upon the defense of ultra vires, however, we may not isolate the $50,-000,000 transaction and view it as a loan made on the sixth day of October without any relation to the transactions of the three months which had preceded it. On July 31, 1931, the bank's deposits amounted to more than $245,000,000. Its business declined until on June 1, 1932, its deposits were less than $148,000,000. From June 1, 1932, to June 25, 1932, the deposits dropped to $128,000,000. The severity of the run on the bank is shown by the fact that on June 25, 1932, more than 4½ million dollars were withdrawn by depositors. A bank's resources, consisting largely of loans, cannot be converted into cash immediately. The bank's officers were brought face to face with an emergency in which they must borrow money or close the bank, with all of the disastrous consequences of such a closing to depositors and stockholders alike. Application for a loan of $10,000,000 was made to the Reconstruction Finance Corporation, and approved. It was apparent at once that a loan for that amount was insufficient, and that unless a loan for a much larger sum could be obtained the bank could not continue in business. On June 27, 1932, plaintiff approved a loan of $90,000,000, including the $10,000,000 for which approval had already been given, on condition that other Chicago banks would loan an additional $5,000,000. The arrangement for the loan did not halt withdrawals by depositors. Deposits dropped to less than $113,000,000 by June 30, and on October 5, 1932, they were less than $73,000,000.

A bank's earnings, of course, depend upon the amount of its deposits. The bank made a net profit of $144,000 in June. During July, August, and September, its net losses were at the rate of more than 1½ million dollars a year. It was imperative that some method should be adopted by which those losses would be cut down as much as possible. It was also clear that the damage to the bank's business had been so serious that there was no reasonable probability that the loss of deposits would not continue. The maintenance of the bank on anything like the scale on which it had been conducted was impossible. As long as the bank was in business, its rent under its leases would probably have to be paid. The interest on the loans obtained in June was more than the earnings from bills receivable and other investments.

The transfer of the deposit liabilities to another bank to be organized, in which stockholders of the old bank were to be given an opportunity to subscribe for stock on the best terms offered to any one, appeared to the directors of the bank to be the best solution of the difficulty. Forty million dollars had been turned over by plaintiff, and a large part of the bank's assets was under the control of the plaintiff as collateral pledged for the loan. The question is: Did the bank have the power to take the remaining $50,000,000 of the loan, make a contract with a new bank for the assumption by it of the deposit liabilities, and turn over to the new bank that $50,000,000, with other cash assets of the bank, as consideration for the assumption agreement by the new bank?

The bank had the power to apply for the $90,000,000 loan. It had the power to

enter into the agreement which was completed by the approval of the Reconstruction Finance Corporation. It had the power to accept the first $40,000,000 of the loan and to give its note for that amount. It had the power to turn over the collateral as a pledge for the entire $90,000,000 loan. It had the power to receive the balance of the loan and to give its note therefor. It was not divested of that power by a change in circumstances which made it necessary, in the opinion of the directors, to make provision for depositors through a contract with another bank instead of trying to continue that branch of its business at a constantly increasing loss.

We do not have here a quasi public corporation abandoning its service to the public.[5] As long as the contract for the protection of its depositors was effective, it was performing its chief duty to the public. The chief duty of a bank is the safekeeping of deposits after it has received them, a duty which this bank and its stockholders were under the same obligation to perform. Texas & Pacific R. Co. v. Pottorff, 291 U. S. 245, 54 S.Ct. 416, 78 L.Ed. 777; Knass v. Madison and Kedzie State Bank, 354 Ill. 554, 567, 188 N.E. 836.

Reliance is placed by defendants upon Richmond v. Irons, 121 U.S. 27, 7 S.Ct. 788, 30 L.Ed. 864, Schrader v. Manufacturers' Bank, 133 U.S. 67, 10 S.Ct. 238, 33 L.Ed. 564, National Shawmut Bank v. Citizens' National Bank of Boston, 287 Mass. 329, 191 N.E. 647, and kindred cases. In my opinion, there is a clear distinction between those cases and the one at bar. It cannot be said that the bank here was in liquidation when the arrangement for the protection of depositors was commenced on June 27, 1932. Nor may it be correctly stated that it was in liquidation when that arrangement was completed on October 6, 1932. While the bank did not receive deposits after October 5, 1932, it carried on other business under its corporate powers, had outstanding a contract for the benefit of its depositors, and did not go into actual liquidation until more than two years after the loan was obtained from plaintiff. The stockholders' liability, which plaintiff is here asserting under its contract, would

have existed in favor of the depositors if they had not been paid through the contract made for their benefit.

Nor do the rules stated in Calumet Dock Co. v. Conkling, 273 Ill. 318, 112 N.E. 982, L.R.A.1917B, 814, Ward v. Joslin, 186 U. S. 142, 22 S.Ct. 807, 46 L.Ed. 1093, Central Transportation Co. v. Pullman's Palace Car Co., 139 U.S. 24, 11 S.Ct. 478, 35 L. Ed. 55, and other like cases cited by defendant, preclude a recovery in this case. Implied powers of a corporation are presumed to exist in order that such bodies may be able to carry out the express powers granted, and to accomplish the purpose of the corporation's creation. A bank does not cease to accomplish the purpose of its creation the moment it ceases to accept deposits and to make loans. The main purpose of its creation is to keep safely the money of its depositors, and nothing can be more germane to the purpose of its creation than agreements to that end. The transaction here must be viewed as a continuing effort of the bank to guard against loss to depositors. It may not be torn into fragments so that the language of cases, inapplicable to the entire transaction, may be applied to one of the steps taken for the accomplishment of the bank's purpose in arranging for the loan. It was thought at first that the bank could be kept open, but circumstances convinced the directors that the provision for depositors which was finally made was best for both depositors and stockholders. The rule of ultra vires, as stated in the cases relied on by defendants, is not applicable, in my opinion, to the facts of this case.

There is a further argument of defendants based upon construction of the provision of the Illinois Constitution (article 11, § 6). Defendant bank, it is said, was not a banking corporation or institution on October 6, 1932, and, therefore, the stockholders are not liable on the $50,-000,000 note given on that date (citing Dillon v. Elmore, 361 Ill. 356, 362, 198 N.E. 128; Wedesweiler v. Brundage, 297 Ill. 228, 130 N.E. 520). The note was given to complete a transaction commenced June 27, 1932, by which defendant bank was making provision for the protection of its de-

---

[5] Chicago Gas-Light Co. v. People's Gas Co., 121 Ill. 530, 13 N.E. 169, 2 Am.St.Rep. 124; People v. Commercial Tel. & Tel. Co., 277 Ill. 265, 269, 115 N.E. 379, L.R.A.1917D, 704; South Chicago City Ry. Co. v. Calumet Electric Street Railway Co., 171 Ill. 391, 397, 49 N.E. 576; Union Trust & Savings Bank v. Telephone Co., 258 Ill. 202, 207, 101 N.E. 535, 45 L.R.A.(N.S.) 465, Ann. Cas.1914B, 258.

positors. The construction of the constitutional provision urged by the defendants, in my opinion, is too narrow, and would defeat, in a large measure, its real purpose. The reasons why, in my opinion, it cannot be said that the bank ceased to be a banking corporation or institution on October 6, 1932, have been stated already.

### The Defense that the Transactions between the Plaintiff, Defendant Bank, and the City National Bank Amounted to a Fraud on the Stockholders.

Some of the defendants assert that the direct purpose of the $50,000,000 transaction was to supply the major portion of the financial structure of the City National Bank; that the business of the old bank could have been preserved for the benefit of its stockholders; that the $50,000,000 was really paid to the new bank; and that the form in which the transaction was carried out was a device to aid in the establishment of the new bank at the expense of the stockholders of the old bank. Plaintiff, it is said, knowingly aided this scheme and is barred in equity from proceeding against the stockholders who were thus defrauded. The court finds that the accusation is not sustained by the evidence.

A consideration of the facts as they are stated in the findings, shows, in my opinion, that the directors acted in good faith and in the honest belief that the course adopted was in the interest of both stockholders and directors. Without doubt, the officers of the bank believed at first that with the loan from plaintiff the bank could continue in business. It was expected that the rapid withdrawal of deposits could be stopped, that old depositors would return and that the bank would regain at least a part of its former standing. The withdrawals continued to the point where the bank was confronted with losses which made it hazardous to continue to receive additional deposits. It is impossible to reach any other conclusion from the evidence in this record. The reasons for the agreement with the City National Bank are stated in the communication sent to the stockholders on October 5, 1932, and the court finds that the statements therein contained are true, and were made in good faith, and without fraud on the part of the directors.

A special meeting of stockholders was held on November 19, 1932. The notice stated that, among other things, the stockholders would be asked to ratify the arrangement made with the City National Bank for the assumption of the deposit liabilities of defendant bank. At that meeting more than two-thirds of the stock was represented in person or by proxy; and, with only 280 shares dissenting, the acts of the directors with reference to the readjustment of the affairs of the bank were ratified. In the face of the evidence in this record the charge of fraud and misconduct now aimed at the directors of the bank, and those who aided in the readjustment of its affairs, cannot be sustained.

Careful consideration has been given to the claim of special equities urged on behalf of stockholders who were not represented at the meeting of November 19, 1932, or who voted against the ratification of the acts of the directors. It has been held above that the carrying out of the $50,000,000 transaction was within the corporate power of the bank. The directors, therefore, had the right to execute the note, and to take the money, and their act in so doing is binding on the bank and its stockholders. If there were any question about the power of the directors to enter into the agreement with the City National Bank, that objection is met by the approval of the stockholders given at the meeting on November 19, 1932. Poppleton v. Wallace, 201 U.S. 245, 26 S.Ct. 298, 50 L.Ed. 743; Hightower v. American National Bank, 263 U.S. 351, 358, 44 S.Ct. 123, 125, 68 L.Ed. 334; Handley v. Stutz, 139 U.S. 417, 11 S.Ct. 530, 35 L.Ed. 227; Synnott v. Cumberland Building Loan Association (C.C.A.) 117 F. 379; American State Bank of Detroit v. Aaron (1935) 271 Mich. 147, 260 N.W. 141, 100 A.L.R. 1266.

### Other Defenses.

In view of the rulings with reference to the defense of ultra vires, it is unnecessary to decide what the rights of plaintiff would have been if the court had held that the $50,000,000 transaction was ultra vires in the true sense. The bank took the money and used it for the benefit of its depositors, and to relieve its stockholders from a liability which otherwise they would have had to the bank's depositors. In Central Transportation Company v. Pullman's Palace Car Co., 139 U.S. 24, 60, 11 S.Ct. 478, 488, 35 L.Ed. 55, the court said: "A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of

its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it." See, also, Awotin v. Atlas Exchange National Bank, 295 U.S. 209, 214, 55 S.Ct. 674, 677, 79 L.Ed. 1393; First National Bank v. Mott Iron Works, 258 U.S. 240, 42 S.Ct. 286, 66 L.Ed. 593; Pullman's Palace Car Co. v. Central Transportation Co., 171 U.S. 138, 18 S.Ct. 808, 43 L.Ed. 108; Logan County Bank v. Townsend, 139 U.S. 67, 76, 11 S.Ct. 496, 35 L.Ed. 107.

In view of the conclusions which the court has reached with reference to the nature of the $50,000,000 transaction, the defense that plaintiff knowingly participated in the liquidation of a bank in violation of the public policy of Illinois must be overruled.

▇▇▇ Defendants object that plaintiff has not proved its averment with respect to other creditors. The bill is brought on behalf of plaintiff and other creditors. Under section 6 of article 11 of the Illinois Constitution every stockholder of a bank is made responsible and liable for all liabilities occurring while he or she remains such stockholder. The court finds that plaintiff has proved the existence of other creditors. The failure to do so, however, in my opinion, would not have been fatal to the bill. Reconstruction Finance Corporation v. Central Republic Trust Company (D.C.) 11 F.Supp. 976, 983, 984, 985.

▇▇▇ Some of the defendants claim that the proceeds of the sale of the collateral should have been applied first to the payment of the $30,000,000 note, before anything was applied on the $50,000,000 note. The collateral was pledged as security for any and all indebtedness of the bank to plaintiff. Plaintiff was given the right, in its discretion, to apply the proceeds of the sale of the collateral to the payment of any item of indebtedness of defendant bank to plaintiff. The court is of opinion that the application as made by plaintiff should stand. If, however, an attempt is made to revise the applications made by plaintiff, it might be held, in view of all the facts with reference to this collateral as shown by the findings, that the proceeds of the sale should have been applied ratably, and that too much has been credited on the $30,-000,000 note.

## Conclusions.

The court finds: The Reconstruction Finance Corporation Act is constitutional; (2) the Reconstruction Finance Corporation has the right to assert the stockholders' liability arising under its contract in this case; (3) courts, by strained construction, should not read into the contracts of plaintiff to which Congress gave the powers of a private corporation, provisions and limitations which Congress could have expressed in a few words if it had intended that they should be there; (4) courts should not place upon the contracts of this corporation created by Congress limitations to the disadvantage of plaintiff and the public treasury and to the advantage of those who would have been subject to a liability to depositors if plaintiff had not loaned the money, unless the plain language of the statute clearly requires it; (5) all of the transactions between the plaintiff and the defendant bank were lawful; (6) all of the transactions between the plaintiff and defendant bank were within the corporate powers of both plaintiff and defendant bank; (7) none of the transactions between plaintiff and defendant bank violate section 207 of the Reconstruction Finance Corporation Act (15 U.S.C.A. § 605d); (8) none of the transactions between plaintiff and defendant violate the public policy of Illinois; (9) defendant bank on October 6, 1932, was a banking corporation or banking institution within the meaning of section 6 of article 11 of the Illinois Constitution; (10) all of the acts of the directors of defendant bank with reference to the readjustment of the affairs of said bank and the contract with the City National Bank & Trust Company for the assumption of its deposit liabilities either were within the power of the board of directors of the bank or were ratified by the stockholders at the meeting on November 19, 1932; (11) plaintiff is not barred by fraudulent or inequitable conduct, or by conspiracy with the officers of the bank to injure stockholders of defendant bank for the benefit of City National Bank & Trust Company, from enforcing its rights in this case; (12) plaintiff has made proper application of the credits resulting from the sale of collateral; (13) defendant bank has liabilities to other creditors than the plaintiff, for

which the defendant stockholders are liable; (14) plaintiff is entitled to a decree in accordance with the prayer of its bill.

A decree in accordance with the above conclusions may be prepared by counsel for plaintiff and presented for entry after giving notice according to the rules of the court.